FILED
COURT OF APPEALS
DIVISION II

2014 JUN 24 AM 9: 01

STATE OF WASHINGTON

BY_____
        DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 42579-3-II |
| Respondent, | PUBLISHED OPINION |
| v. | |
| CLABON TERREL BERNIARD, | |
| Appellant. | |

BJORGEN, J. — Clabon Terrel Berniard appeals his jury convictions and exceptional sentence for first degree felony murder, burglary, two counts of first degree robbery, and two counts of second degree assault based on his participation in a 2010 robbery at the home of James and Charlene Sanders[1] and their two children, JS and CK. As aggravating factors, the jury found by special verdict that Berniard used a high degree of sophistication or planning in committing the crimes and that his conduct with respect to one of the assault and one of the robbery charges manifested deliberate cruelty to the victims.

On appeal, Berniard argues that the trial court (1) violated his right to a jury trial by dismissing a juror during deliberations; (2) violated his confrontation clause rights by admitting

---

[1] We refer to James and Charlene Sanders by their first name for clarity. We intend no disrespect.

police testimony concerning statements made by his codefendants; (3) violated his rights under article I, section 3 of the Washington Constitution by admitting Charlene's identification from a news broadcast; (4) erred under the Privacy Act, chapter 9.73 RCW, in admitting a recording of a journalist's interview with Berniard's family members; and (5) violated the prohibition against double jeopardy by entering convictions for all of the crimes where the proof of some of the charges required proof of certain others. Berniard also appeals from the exceptional sentence imposed, arguing that the trial court erred in (1) applying the aggravating factors; (2) not permitting the jury to answer "no" on the special verdict forms; and (3) refusing to consider some of the offenses as the same criminal conduct in calculating his offender score.

Because the trial court violated Berniard's confrontation and jury trial rights, we reverse and remand for further proceedings. We therefore find it unnecessary to reach Berniard's double jeopardy, Privacy Act, and eyewitness identification claims, as well as his challenges to the sentence imposed.

## FACTS

Following a home invasion robbery in which one participant shot and killed James, the State charged Joshua Reese, Amanda Knight, Kiyoshi Higashi, and an unidentified fourth participant with a number of crimes. Ultimately, the State charged Berniard, as the fourth participant, with first degree felony murder, burglary, and two counts each of first degree robbery and second degree assault. The State sought firearm sentencing enhancements and alleged aggravating factors of deliberate cruelty and a high degree of sophistication or planning

No. 42579-3-II

on all counts. The trial court severed the cases, and Berniard was tried separately.[2]

The victims' testimony at Berniard's trial established that Knight and Higashi initially obtained entrance to the Sanders's home posing as potential buyers of a ring the Sanders had advertised on the web site "Craigslist." Verbatim Report of Proceedings (VRP) at 900-03. Higashi then drew a gun and ordered James and Charlene to lie face down on the floor. They complied, and Knight and Higashi restrained their hands with plastic zip ties, taking the wedding rings from Charlene's and James's fingers.

On a signal from Knight, two additional intruders, wearing masks and armed with guns, entered the home and proceeded to the second story, where they ordered the Sanders's two children, JS and CK, downstairs. One of these masked intruders, identified by the victims as "the mean one," demanded the location of the Sanders's safe, threatening to kill the victims. VRP at 909-10, 932. He kicked Charlene in the head, pointed a gun at her head, and began counting backwards from three.

At that point, Charlene told the perpetrators that the safe was in the garage. As Higashi and another intruder took James toward the garage, he broke free from the zip ties and a fight ensued. JS, who remained unrestrained, joined the struggle, and in the course of the fight the perpetrators beat JS severely with a pistol and shot James repeatedly, killing him. The four then fled the scene.

---

[2] We have already affirmed the convictions of Berniard's codefendants. *State v. Knight*, 176 Wn. App. 936, 309 P.3d 776 (2013), *review denied*, 179 Wn.2d 1021, 318 P.3d 279 (2014); *State v. Reese*, 177 Wn. App. 1006, 2013 WL 5592952 (2013), *review denied*, 179 Wn.2d 1017, 318 P.3d 279 (2014); *State v. Higashi*, 171 Wn. App. 1015, 2012 WL 5354547 (2012). The circumstances of the crimes appear in some detail in those opinions. We have limited the discussion here to essential background and those facts directly relevant to the legal issues presented in Berniard's appeal.

3

A few days later, California police apprehended Knight, Reese, and Higashi. All three ultimately made statements implicating themselves and a fourth participant. Police later determined that the fourth participant, known to the perpetrators as "YG," was Berniard. VRP at 1380-81.

Prior to trial, Berniard moved to suppress certain evidence the State intended to introduce, including Charlene's identification of Berniard as one of the participants, a video recording of a conversation with Berniard's family members made by KOMO reporters, and the statements his codefendants had made to police. Except as to the KOMO recording, the court ultimately denied the motions, but entered written orders limiting the State's use of some of the evidence.

The court's order denying Berniard's motion to suppress incriminating statements made by his codefendants limited the State to using the codefendants' statements to establish their own involvement and to explain the course of the investigation. At trial, the State introduced a number of statements from the codefendants in the form of testimony from the investigating officers. One officer testified extensively about Knight's statements regarding the planning and execution of the crimes, including the participation of other codefendants, over Berniard's objection and in violation of the court's order on motions in limine. Another officer testified that Reese and Higashi had identified the other people involved in the crimes and shortly thereafter testified that he began seeking to identify a black male known as "YG," whom he later discovered was Berniard. VRP at 1380-81. Telephone records showed that, in the period before the robbery, a cell phone associated with Berniard received calls from the other perpetrators' cell

4

phones and made calls using the same cell tower as the phone Knight used to make an appointment to see the advertised ring.

The jury began deliberations after more than two weeks of testimony. On the day after deliberations began, the court held a hearing to discuss a report from court staff concerning their interactions with juror 2. At the hearing, jury administrator Connie Janiga described the following contact with that juror:

> [A]s [juror 2] is handing me her [parking] validation, I said something like, Have a good day at jury service. And she burst into tears. And I'm like, Oh, are you okay? And so I gave her, you know, Here is some [Kleenex]. And she said, I thought I was going to be okay. I thought I could do it. This has been so stressful for me.
> I said, You know, we do have a service that will assist you with this. And I reached over, and I got one of Judy Snow's cards out, and I passed it across to her. And she said, You know, I didn't sleep at all last night. And I said, Well, I think that's what this service is for. And that's all that was said.

Clerk's Papers (CP) at 2214. Juror 2 apparently spoke to Janiga between 8:00 and 9:00 a.m. on August 25, 2010.

The court then examined juror debriefer Judy Snow, who testified at length about her subsequent interactions with juror 2. According to Snow's testimony, the juror spoke to Snow on the telephone at around 11:30 a.m., then again in person in the afternoon of the same day. On examination by the court, Snow initially described their interactions as follows:

> I had a phone call message this morning saying that she was a juror and my name was given to her by [Juror Administrator] Connie [Janiga] and that she seemed very distressed and asked if I would return the call. So I returned the call probably around 11:30. She stated to me she was quite distressed about a case and that it was very – she felt like she could harm herself, that it got to the point that if she had to continue on like this that she could do serious damage to herself. I told her I would be more than happy to meet with her. I asked her what case it was and when was the case over. She advised me that the case was still going on and which case it was.

So at that point I told her that I advised her that if it was traumatic, I'm there to support her, that I need to advise the court, would she be safe until 1 o'clock until I came and saw her and talked with the court. And she said that she would.

At that point, I called court escort officers and found out that they were starting at 1 o'clock, and they advised me that no, they are in deliberations. So I found out at that point they were in deliberations. Then I came to the court and advised you. I saw her outside. She asked if she could speak with me, and I said, no, I couldn't discuss anything with her. I needed to advise the court.

She did say, I want you to know that I feel better after talking with you – and I said I was happy about that – and I don't think I could hurt myself, actually hurt myself. She did say that she felt like it could get to the point where everybody would be against her. So it was very traumatic for her, the jury process.

VRP at 2219-20. Snow reiterated that "[juror 2] said that she was fearful that all the jurors would be against her." VRP at 2220.

The court then invited the attorneys to question Snow. On examination by Berniard's attorney, Snow stated that

I did speak to her about how she was feeling. She felt that she felt much more optimistic that there would be a jury debriefer after deliberations after this – if she continued with deliberations. She stated, "I would want to do that."

VRP at 2221. On questioning from the deputy prosecutor, Snow also testified that

[Juror 2] stated to me also that she had these thoughts starting to come into her head about harming herself as a way out and she doesn't think she would act on them, but they were intrusive – what I interpreted as intrusive thoughts of self-harm. She was very tearful, crying rather hysterical on the phone.

[State]: Did she appear that same demeanor when you met her in person?

[Snow]: As we were talking near the room, no. She was continuing to cry, but felt that this was a very difficult decision-making process to be on a jury of such magnitude and that she was feeling that she could continue.

VRP at 2223. The State then moved to dismiss juror 2 for misconduct, or in the alternative, as unfit for jury service due to a mental defect, and substitute an alternate. Berniard objected on

Sixth Amendment grounds. The court reserved ruling until the following day to allow the parties to brief the issue.

After reconvening, the court found no juror misconduct because juror 2 did not discuss the substance of deliberations. Berniard requested that the court inquire whether juror 2's distress resulted from being in the minority, arguing that to dismiss her without doing so would violate his jury trial rights. Instead, the court ruled as follows:

> Juror 2 sought out the help of Judy Snow as the juror debriefer after she was given that information by the jury administrator yesterday morning. And Juror 2 quite clearly admitted that she had thoughts of self-harm if she continued as a juror. She was not specific about this case or about the case being in deliberations. She later also explained that it could happen if everyone was against her. Again, she had intrusive thoughts of self-harm. This clearly, because of her unstable mental and emotional condition, makes her unfit to serve as a juror in this matter. The reference to everyone else being against her does not in my mind arise to the level of showing evidence that she is actually a hold-out juror in this situation. . . . So we will dismiss Juror Number 2.

VRP at 2248-49. After a brief colloquy, the court substituted an alternate and instructed the jury to begin deliberations anew.

The reconstituted jury returned guilty verdicts on all counts and answered "yes" on special verdict forms finding a high degree of sophistication or planning as to all counts. CP at 392-409. The jury also found that Berniard's conduct exhibited deliberate cruelty to the victims on one count of robbery and one count of assault. Berniard timely appeals.

## ANALYSIS

Of Berniard's many claims, two require reversal: the trial court violated Berniard's right to a unanimous verdict from an impartial jury and his right to confront the witnesses against him. Resolving the appeal on these grounds, we decline to reach the remainder of his claims. We first

address the trial court's dismissal of juror 2, then the investigating officers' testimony concerning statements made by Berniard's codefendants.

## I. Improper Dismissal of a Deliberating Juror

Berniard argues that the trial court's dismissal of juror 2 violated his right to a unanimous verdict from an impartial jury under the federal and Washington constitutions and that the dismissal constituted an abuse of discretion under the governing statute. Specifically, Berniard contends that juror 2's statement, related to the court by Snow, that she feared all the other jurors would be against her, established a reasonable probability that the grounds for dismissal stemmed from juror 2's assessment of the merits of the State's case. Therefore, Berniard argues, the trial court erred in refusing to allow examination of juror 2 and should have either allowed juror 2 to continue deliberating or declared a mistrial.

The State responds that the trial court was under no duty to examine juror 2 or to inquire further into her fitness for jury duty and that the court properly concluded, based on the testimony of Snow and Janiga, that juror 2 was unfit to serve as a juror due to a mental defect. The State asserts that no heightened standard of review applies because juror 2's comments to Snow did not raise the possibility that juror 2's distress resulted from being a "holdout juror," and that the dismissal did not result from an allegation that juror 2 was refusing to follow the law. Br. of Resp't at 13.

Washington statute provides that

[i]t shall be the duty of a judge to excuse from further jury service any juror, who in the opinion of the judge, has manifested unfitness as a juror by reason of bias, prejudice, indifference, inattention or any physical or mental defect or by reason of conduct or practices incompatible with proper and efficient jury service.

RCW 2.36.110. We have interpreted this statute, along with CrR 6.5, which specifies the procedure for substituting an alternate for a dismissed juror in criminal cases, to "place a continuous obligation on the trial court to excuse any juror who is unfit and unable to perform the duties of a juror." *State v. Jorden*, 103 Wn. App. 221, 227, 11 P.3d 866 (2000).

This obligation, however, may easily ensnarl the workings of central constitutional rights. Our Supreme Court has interpreted article I, section 21 of the Washington Constitution to guarantee criminal defendants the right to a unanimous jury verdict.[3] *State v. Ortega-Martinez*, 124 Wn.2d 702, 707, 881 P.2d 231 (1994). Both the federal and Washington constitutions also guarantee criminal defendants the right to trial by an impartial jury. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. The defendant, however, "has no right to be tried by a particular juror or by a particular jury." *State v. Gentry*, 125 Wn.2d 570, 615, 888 P.2d 1105 (1995).

Viewed in the abstract, the dismissal of a juror whose emotional response to the case imperiled her health or ability to deliberate would not seem to threaten any constitutional flaws. Facts, though, have a way of complicating abstractions. If, as argued here, the juror's emotional state which led to her dismissal arose in part from her perceived status as a minority of one, the dismissal could be characterized as arising from the juror's view of the merits. Of greater potential damage, if emotional stress tended to arise more frequently from holdout status, the unexamined dismissal of a juror for that stress could unintentionally cull holdout jurors.

---

[3] In a fractured opinion, the United States Supreme Court declined to apply the federal right to a unanimous verdict to the states through incorporation into the Fourteenth Amendment. *Apodaca v. Oregon*, 406 U.S. 404, 406, 92 S. Ct. 1628, 32 L. Ed. 2d 184 (1972). Because the Washington Constitution also guarantees this right, however, we consider cases involving alleged violations of the right to a unanimous verdict in federal prosecutions "instructive." *State v. Elmore*, 155 Wn.2d 758, 771 n.4, 123 P.3d 72 (2005).

The appropriate standard to apply in reviewing a trial court's dismissal of a juror depends on the nature of the request for the dismissal. In *State v. Elmore*, 155 Wn.2d 758, 778, 123 P.3d 72 (2005), our Supreme Court held that, as long as the trial court applied the correct evidentiary standard, an appellate court reviews a trial judge's decision to dismiss a juror for abuse of discretion. A trial court abuses its discretion if its "decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons." *State v. Rundquist*, 79 Wn. App. 786, 793, 905 P.2d 922 (1995) (internal quotation marks omitted). A court acts on untenable grounds "if its factual findings are unsupported by the record," acts for untenable reasons "if it has used an incorrect standard," and its decision is manifestly unreasonable "if its decision is outside the range of acceptable choices given the facts and the legal standard." *Rundquist*, 79 Wn. App. at 793.

The *Elmore* court, however, also adopted the "any reasonable possibility" standard employed by the Ninth Circuit Court of Appeals in reviewing cases "where a request for juror dismissal focuses on the quality of a juror's thoughts about the case and his ability to communicate those thoughts to the rest of the jury." *Elmore*, 155 Wn.2d at 775, 778. Under this heightened evidentiary standard, "[w]here there is a reasonable possibility that the impetus for the complaint is the juror's views on the merits, 'the trial judge has only two options: send the jury back to continue deliberating or declare a mistrial.'" *Elmore*, 155 Wn.2d at 776 (quoting *United States v. Symington*, 195 F.3d 1080, 1087 (9th Cir. 1999)).

Unlike the present appeal, *Elmore* involved claims that a deliberating juror refused to follow the court's instructions and disregarded all of the State's witnesses as not credible. Even with this difference, the reasons why *Elmore* followed the "any reasonable possibility" standard

10

speak strongly for its use here. First, the court noted that, unlike in other cases of alleged juror misconduct or bias, a trial court's inquiry into a claim that a juror refuses to follow the law necessarily risks intruding on the secrecy of jury deliberations. *Elmore*, 155 Wn.2d at 770-71. Thus, the court admonished that "trial courts investigating such allegations must take special care not to delve into the substance of deliberations or the thought process of any particular juror." *Elmore*, 155 Wn.2d at 771. The same hazard lies in any inquiry into the reasons for juror 2's distress. As in *Elmore*, the "any reasonable possibility" standard lessens that concern.

The *Elmore* court also rested its holding on the grounds that dismissal of a holdout juror implicates the defendant's rights to both an impartial jury and a unanimous verdict. 155 Wn.2d at 771-72. On the one hand, such a dismissal could "enable the government to obtain a conviction even though a member of the jury that began deliberations thought that the government had failed to prove its case." *Elmore*, 155 Wn.2d at 771 (quoting *Sanders v. Lamarque*, 357 F.3d 943, 945 (9th Cir. 2004)) (internal quotation marks omitted). On the other, it raises the prospect that the "trial court is reconstituting a jury in order to reach a particular result" and may give the reconstituted jury the "impression that the trial judge prefers a guilty verdict." *Elmore*, 155 Wn.2d at 772. Each of these dangers may arise if a juror is disqualified due to distress arising from holdout status. As in *Elmore*, the "any reasonable possibility" test helps secure the rights to an impartial jury and a unanimous verdict in that setting.

The *Elmore* court limited the application of this heightened standard to "the rare case where a juror is accused of engaging in nullification, refusing to deliberate, or refusing to follow the law." 155 Wn.2d at 778. The *Symington* court, however, whose reasoning the *Elmore* court adopted, 155 Wn.2d at 781, did not limit its holding in the same way. The *Symington* court

11

based its reasoning on the "special challenges" a trial court faces "when attempting to determine whether a problem between or among deliberating jurors stems from disagreement on the merits of the case" and limited the rule announced to "cases where the allegations go to the quality and coherence of the juror's views on the merits." *Symington*, 195 F.3d at 1086, 1087 n.6.

Subsequently, in *State v. Depaz*, 165 Wn.2d 842, 853-55, 204 P.3d 217 (2009), our Supreme Court declined to extend the heightened "reasonable possibility" standard to dismissal of a holdout juror[4] accused of inappropriately discussing the case with her husband. The court rested its holding on the ground that investigation of that type of allegation would not "necessarily require investigation into the jury's deliberations." *Depaz*, 165 Wn.2d at 855.

The *Depaz* court nonetheless held a finding of misconduct alone insufficient to justify a dismissal "that will have a direct and foreseeable effect on the outcome of the case . . . because the court cannot avoid considering the effect of the removal on the jury's deliberations." 165 Wn.2d at 857. Thus, the *Depaz* court held that

> where the trial court has knowledge of a deliberating juror's substantive opinion of the case, trial courts must make a determination regarding prejudice. Prejudice should be determined by concluding whether any misconduct committed by the juror has affected the juror's ability to deliberate before deciding to excuse the juror under RCW 2.36.110.

*Depaz*, 165 Wn.2d at 857. Ultimately, the court held that the trial court had "abused its discretion by reaching a decision based on untenable reasons" because, contrary to the trial court's view, the record did not support a finding that the improper communication prejudicially influenced the juror. *Depaz*, 165 Wn.2d at 862.

---

[4] The trial court had learned that the juror held a minority viewpoint favoring acquittal inadvertently, when the juror volunteered the information in response to questioning by the court regarding the improper communication. *Depaz*, 165 Wn.2d at 847, 855 n.2.

The State likens the present case to *Jorden*, 103 Wn. App. 221, where we held that a trial court did not abuse its discretion in dismissing a sitting juror whom the judge, the bailiff, and the attorneys had observed sleeping during the presentation of evidence, nor in denying the defense an opportunity to first examine the accused juror. However, the judge's personal observation of the juror sleeping and her dismissal prior to the start of deliberations, facts on which we relied in our analysis, greatly distance *Jorden* from the facts of this case. 103 Wn. App. at 229-30. *Elmore*'s reasons for applying the heightened standard are wholly absent from *Jorden*.

As Berniard points out, this case much more closely resembles *State v. Johnson*, 125 Wn. App. 443, 105 P.3d 85 (2005), a felony murder prosecution in which we held that the trial court's dismissal of a deliberating juror violated the defendant's jury trial rights. There, a juror asked the court to dismiss her after she experienced extreme stress during deliberations. *Johnson*, 125 Wn. App. at 451-52. The court examined the foreperson, who testified that the juror was "emotionally 'distraught,'" cried a lot, would retreat to the corner and stop communicating, and that her condition was deteriorating. *Johnson*, 125 Wn. App. at 451. Examination of the juror, however, suggested that her stress resulted in large part from disagreements about the jury instructions and how to conduct deliberations, and "did not indicate at any time that she was unable to proceed due to unrelated health or emotional concerns or that she was unable or unwilling to participate in the deliberations process." *Johnson*, 125 Wn. App. at 451-52, 458-59.

The State, in attempting to distinguish *Elmore*, points out that here "none of the other jurors requested the court's assistance with" juror 2. Br. of Resp't at 15. Our analysis in *Johnson*, discussed above, makes clear that the source of the initial complaint has no bearing on the propriety of dismissing a deliberating juror. 125 Wn. App. at 451-52. The *Elmore* court

13

itself pointed out that trial courts "must be equally careful" when the complaint originates with the dismissed juror herself. *Elmore*, 155 Wn.2d at 772 n.5 (citing *United States v. Brown*, 823 F.2d 591, 595-97 (D.C. Cir. 1987)) (reversing conviction even though dismissed juror himself requested dismissal). Here, furthermore, the party moving to dismiss juror 2, over Berniard's objections, was the State. Thus, the fact that juror 2's purported unfitness came to the court's attention due to that juror's own complaints about the stress of deliberations is immaterial.

To summarize, the *Elmore* court applied the heightened "any reasonable possibility" standard based on a number of considerations: (1) whether the request for juror dismissal focuses on the quality of a juror's thoughts about the case, (2) whether there is a reasonable possibility that the impetus for the complaint is the juror's views on the merits, (3) whether the dismissed juror was a holdout, and (4) the need to preserve the secrecy of jury deliberations.

The remarks attributed to juror 2 by Snow plainly imply that the juror's distress likely stemmed, at least in part, from a difference of opinion with other jurors concerning the merits of the State's case. Contrary to the trial court's finding that the statement did not "[]rise to the level of showing evidence that she is actually a hold-out juror," the main explanation Snow related for juror 2's distress was that juror's fear "that all the jurors would be against her." VRP at 2220, 2249. Furthermore, her statements in no way establish that juror 2 could not continue deliberating: to the contrary, Snow reported that juror 2 said she could continue and apparently wished to do so. Thus, the reasons that led the *Elmore* court to apply the heightened standard also urge its application here.

As noted above, *Elmore* limited the heightened standard to "the rare case where a juror is accused of engaging in nullification, refusing to deliberate, or refusing to follow the law." 155

14

Wn.2d at 778. The present appeal admittedly does not fall within those categories. As also noted, however, the Supreme Court in a subsequent case declined to extend the heightened standards because a challenge to a juror's dismissal would not "necessarily require investigation into the jury's deliberations." *Depaz*, 165 Wn.2d at 855. Here, the challenge to juror 2's dismissal risks just that investigation. Under *Elmore* and *Depaz*, the heightened standard should be applied to the present circumstances.

Under that standard, we hold that the trial court erred in dismissing juror 2 without further inquiry into the cause of her complaint. Snow's testimony establishes that the State's motion to replace juror 2 implicated "the quality and coherence of the juror's views on the merits" and raised a "reasonable possibility" that juror 2's distress arose "from disagreement on the merits of the case." *Symington*, 195 F.3d at 1086, 1087 n.6. In these circumstances, the trial court had a duty to conduct a balanced investigation and apply the heightened evidentiary standard. *See Elmore*, 155 Wn.2d 774-75. Despite Berniard's timely and specific request, the court did neither. This error led to the removal of a juror who had begun deliberations and may have believed that the State had not met its burden, violating Berniard's right to unanimous verdict, and may have suggested to the reconstituted jury that the court preferred guilty verdicts, violating Berniard's right to an impartial jury.

Denial of the right to an impartial trier of fact is a classic structural error, requiring reversal without a showing of prejudice. *See Chapman v. California*, 386 U.S. 18, 24 n.8, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967) (citing *Tumey v. Ohio*, 273 U.S. 510, 535, 47 S. Ct. 437, 71 L. Ed. 749 (1927) (reversing the defendant's conviction despite clear evidence of guilt because "[n]o matter what the evidence was against him, he had the right to have an impartial judge")).

The remedy for improper dismissal of a deliberating juror is reversal and remand for a new trial. *Elmore*, 155 Wn.2d at 781. We reverse Berniard's convictions and remand for further proceedings consistent with this opinion.

## II. CONFRONTATION CLAUSE VIOLATION

Because the issue is likely to recur, we also address Berniard's claim that the trial court violated his rights under the confrontation clause of the Sixth Amendment. Berniard argues that, because he had no opportunity to cross-examine his codefendants, the testimony of investigating officers concerning statements Knight, Reese, and Higashi made during custodial interrogation violated his right to confront the witnesses against him. We agree.

In all federal and state criminal prosecutions, the Sixth Amendment's confrontation clause guarantees that, "the accused shall enjoy the right . . . to be confronted with the witnesses against him." *Crawford v. Washington*, 541 U.S. 36, 42, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). Regardless of state law or rules of evidence, a trial court may admit "testimonial statements" of witnesses not present at trial only if (1) the declarant is unavailable, and (2) the defendant had a prior opportunity to cross-examine the declarant concerning the statements. *Crawford*, 541 U.S. at 53-54, 59-61. The defendant, however, must timely raise the issue in the trial court. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 327, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009) ("The defendant always has the burden of raising his Confrontation Clause objection.") (emphasis omitted). Appellate courts review confrontation clause challenges de novo. *State v. Mason*, 160 Wn.2d 910, 922, 162 P.3d 396 (2007) (*Mason I*).

Here, officers testified extensively concerning statements the codefendants made concerning the planning and execution of the robbery, the number of participants, the weapons

used, and the property taken. Detective Kevin Johnson, for example, testified that Knight had told him that "she was part of a plan to commit a robbery in [the Sanders's] residence"; that "she was involved in looking [for] expensive items on Craigslist to steal"; that "she had a plan to go into the house, tie them up, and ransack the house, looking for expensive things to take"; that "there were four people involved, including herself"; that "she was wearing a Bluetooth ear phone device at the time . . . [with] an open line . . . [s]o that someone outside could hear what was going on"; and that "once [James and Charlene] were zip tied two more people entered the house . . . [who] were both armed." VRP at 1213-1216. Johnson also testified that Knight told him "she took Charlene Sanders' wedding ring off her finger"; that "she pawned Jim Sanders' wedding ring in California"; and that "she provide[d] information . . . about other participants in this event." VRP at 1540-41.

Detective Timothy Donlin testified that he interrogated Higashi, who told him that he "planned to commit a robbery"; that "he pulled a gun on Mr. and Mrs. Sanders"; that "he took the ring that had been advertised on Craigslist [and] an iPod"; that "he went into the garage to look for a safe"; and that "while in California he sold two of the rings that were stolen from the [Sanders's] home." VRP at 1554-55. Similarly, Detective John Jimenez testified that he interrogated Reese, who admitted that "he had a plan to find expensive stuff on Craigslist to set up a robbery"; that "he waited outside Jim Sanders' house wearing a Bluetooth phone device with an open line"; that "he was armed with a .22 revolver"; and "that he stole property from the upstairs portion of the residence." VRP at 1462-63.

Some of Detective Jimenez's testimony about Reese's and Higashi's statements also implied that Berniard was the fourth participant:

Q.     On May 4th, did you have occasion to interview Joshua Reese?
A.     Yes, I did.
Q.     And did you interview him again on May 5th?
A.     Yes, ma'am.
Q.     Did you ask him about his involvement in this crime?
A.     Yes, we did.
Q.     Did he provide information to you about his involvement?
A.     Yes.
Q.     Did you ask him about the other people involved in this crime?
A.     Yes.
Q.     And did he provide information to you about that?
A.     Yes, he did.

. . . .

Q.     After he arrived here . . . , did you have occasion to interview Kiyoshi Higashi?
A.     Yes, I did.
Q.     Did he tell you about his participation in this crime?
A.     Yes, he did.
Q.     Did you ask him who the other participants were?
[Defense Counsel]:    Objection.
THE COURT:          Overruled.
A.     Yes, we did.
Q.     [Deputy Prosecutor Robnett]: And did he provide information to you?
A.     Yes, he did.

VRP at 1365-66, 1377-78. After asking a series of 15 questions about Charlene's wedding ring,

the prosecutor returned to the subject of the other participants;

Q.     During the course of this investigation, did you begin trying to identify a black male known as YG?
A.     Yes, ma'am.
Q.     Did you have information that YG was involved in a traffic stop in Federal Way, specifically an illegal U-turn?
A.     Yes.

. . . .

Q.     And were you able to determine that the driver of that vehicle was Clabon Berniard?
A.     Yes.
Q.     Have you since been able to determine that [Berniard] sometimes goes by the name YG?
A.     Yes, ma'am.

18

VRP 1380-81. Although Jimenez did not directly state that the codefendants identified Berniard, only the most inattentive juror could have missed the implication that Reese and Higashi had identified Berniard, also known as "YG," as the fourth participant.

As the State properly concedes, the statements at issue here qualify as testimonial: "Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard." *Crawford*, 541 U.S. at 52. Berniard had no opportunity to cross-examine the declarants, Knight, Higashi, and Reese, all of whom the trial court expressly found unavailable to testify.[5] Finally, Berniard repeatedly objected to the detectives' testimony concerning the statements on confrontation clause grounds, both before trial and contemporaneously, and the court allowed him a standing objection.

The trial court admitted the testimony, however, on the ground that the statements were not offered for "the truth of the matter asserted, but rather to explain why the police were pursuing the identity of YG," relying on *Mason*, 127 Wn. App. at 566 (*Mason* I). VRP at 804. The court required the State to limit introduction of the codefendants' statements to matters relating to their own participation in the crimes,[6] and instructed the jury to consider the statements "only for the purpose of determining [their] involvement in the charged crime." CP 377-79. These limitations comply with the rules for admission of inculpatory statements made

---

[5] Reese and Knight invoked the privilege against self-incrimination. Higashi did not explicitly do so, but used his appearances on the stand to mock the deputy prosecutors, answering most of the State's questions with evasions, jokes, or insults and claiming a lack of memory due to heavy marijuana use. After Higashi admitted that he had never intended to give testimony, but "just came here to waste you all time," the court found him "uncooperative" and "unavailable." VRP at 1505-06.

[6] As the State properly conceded, the testimony concerning Knight's statements exceeded the scope of the court's order on Berniard's motion in limine.

by codefendants in *joint trials* as laid out in *Richardson v. Marsh*, 481 U.S. 200, 201-11, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987) and its progeny.

In a similar vein, the State argues that, because the statements admitted did not explicitly reference him, Reese, Knight, and Higashi were not "witnesses against" Berniard, so the confrontation issue does not even arise. Br. of Resp't at 19-20. The State's argument relies on *In re Personal Restraint of Hegney*, 138 Wn. App. 511, 543-47, 158 P.3d 1193 (2007), decided after *Crawford*, in which this court adhered to the rule in *Richardson* and held that admission of a codefendant's confession in a joint trial does not violate the confrontation clause if (1) it does not refer to the nonconfessing codefendant by name, (2) it contains no obvious redactions, and (3) the court instructs the jury to consider the statement only as to the defendant who made it.

The *Hegney* court reasoned that the absence of obvious redactions and the limiting instruction prevented the confessing codefendant from being a witness against Hegney, and thus admission of the statements did not violate Hegney's confrontation clause rights. *Hegney*, 138 Wn. App. at 547. The court noted that the codefendant's confession "may have become incriminating when linked with other evidence introduced at trial," but considered this irrelevant to its admissibility under the confrontation clause. *Hegney*, 138 Wn. App. at 547 n.15.

Neither *Mason* I nor *Richardson* nor *Hegney* allow for the admission of a codefendant's inculpatory statements under the circumstances presented here. To begin with, this was not a joint trial, so *Richardson* and *Hegney* are simply inapposite. The only issues in this case involved Berniard's culpability; if the statements were not offered "against" Berniard, then, as defense counsel pointed out, they were irrelevant.

Rather than supporting it, *Mason I* further undermines the trial court's confrontation clause analysis. In its review of Mason's trial, Division One of this court held that the admission of certain statements made to police did not violate the confrontation clause even though the declarants did not testify at trial, relying in part on the view that some of the statements were not testimonial and in part on reasoning similar to the trial court's here. *Mason* I, 127 Wn. App. at 560-68. Like the trial court, Division One of our court held that certain statements were "not admitted for the truth of the matter asserted" and were not admitted "so that [the declarant] could bear witness against Mason." *Mason* I, 127 Wn. App. at 566. Thus, they were deemed not to be subject to Crawford's limitations. *Mason* I, 127 Wn. App. at 564-68. On review, our Supreme Court *rejected* the reasoning that a statement is immunized from a confrontation clause challenge simply because it is not offered for the truth of the matter. *Mason* II, 160 Wn.2d at 921-22. Here, there is no question that the statements were testimonial.

As our Supreme Court noted in *Mason* II, courts must "guard against any 'backdoor' admission of inadmissible hearsay statements" that violate the confrontation clause. *Mason* II, 160 Wn.2d at 921. We have held that the defendant's confrontation rights were not implicated by an officer's testimony that, after "contacting people at the location to find out what exactly happened," he arrested the defendant. *State v. O'Hara*, 141 Wn. App. 900, 909-11, 174 P.3d 114 (2007), *reversed on other grounds*, 167 Wn.2d 91, 217 P.3d 756 (2009). In that case, however, we specified that "[a]n officer may appropriately describe the context and background of a criminal investigation, *so long as the testimony does not incorporate out-of-court statements*." *O'Hara*, 141 Wn. App. at 910 (emphasis added).

Here, Jimenez testified that Reese and Higashi both explicitly identified the other people involved in the crimes. Shortly thereafter, Jimenez testified that he began trying to identify a black male known as YG, whom he later discovered was Berniard. This testimony "incorporate[d] out-of-court statements" and was tantamount to telling the jury that Reese and Higashi identified Berniard as one of the participants. *O'Hara*, 141 Wn. App. at 910.

Moreover, the statements at issue here plainly served to help establish other matters in the case. Even assuming that the jury could perform the mental gymnastics necessary to not consider the statements with respect to Berniard's involvement, the statements go to more than just the number and identity of the participants in the crime. Johnson, for example, testified extensively about Knight's statements regarding the planning and execution of the crimes, over Berniard's objection and in clear violation of the court's order on motions in limine. Since the State sought firearm enhancements, as well as sentencing enhancements for a high degree of sophistication and planning and for deliberate cruelty, the statements plainly implicated Berniard's culpability.

The State's reliance on principles of accomplice liability further demonstrates that the codefendants were witnesses against Berniard. The State sought sentencing enhancements based on the allegation that "the defendant, or an accomplice, was armed with a firearm." CP at 322-26. At the State's request, the court instructed the jury on accomplice liability, and the State relied extensively on accomplice liability in closing argument. Thus, the State's theory encouraged the jury to use the codefendants' statements against Berniard. The officers' testimony amounted to a "backdoor" introduction of inadmissible out-of-court statements. *Mason* II, 160 Wn.2d at 921.

22

The trial court's direction prohibiting the officers from explicitly stating that the codefendants identified Berniard as the fourth perpetrator does not prevent the constitutional violation. In *Melendez-Diaz*, 557 U.S. at 311-12, the court held that declarations from crime lab analysts that a substance tested positive for cocaine were testimonial, and that the analysts were therefore "witnesses" against the accused. That the declarations did not name the defendant, and only implicated him by inferences based on other evidence, did not alter the analysis. *Melendez-Diaz*, 557 U.S. at 313-14. Berniard's co-participants, furthermore, were not on trial: the only relevant purpose for introducing the statements was to establish Berniard's culpability. Under *Crawford* and *Mason* II, admission of the statements by the other participants violated Berniard's right to confront the witnesses against him.

Because this is a constitutional violation, the State bears the burden of showing the admission of these statements harmless beyond a reasonable doubt. *State v. Coristine*, 177 Wn.2d 370, 380, 300 P.3d 400 (2013). The State makes no attempt to do so in its briefing.

We will hold a confrontation clause violation harmless only where the untainted evidence overwhelmingly establishes no reasonable probability of a different outcome. *Mason* II, 160 Wn.2d at 927. The identity of the fourth participant, the degree of planning and sophistication, and the level of cruelty were key issues in the case. The remaining evidence on some of these points, although substantial, cannot be called overwhelming. The State has not met its burden. The remedy is reversal and remand for a new trial. *Gray v. Maryland*, 523 U.S. 185, 197, 118 S. Ct. 1151, 140 L. Ed. 2d 294 (1998).

CONCLUSION

We hold that the trial court erred in dismissing juror 2 without adequate investigation into the cause of the complaint, where the circumstances showed a reasonable possibility that her distress arose out of a difference with other jurors regarding the merits of the case. The dismissal amounted to a structural error. We also hold that the trial court's admission of testimony concerning incriminating out-of-court statements made by Berniard's codefendants violated the confrontation clause. The State has not shown the error harmless beyond a reasonable doubt.

Having resolved the appeal on these grounds, we decline to reach Berniard's remaining claims. We reverse Berniard's convictions and remand for further proceedings.

BJORGEN, J.

I concur:

WORSWICK, J.

I concur in the result only:

JOHANSON, C.J.