# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

STATE OF WASHINGTON,

                Respondent,

        v.

ATERE KEVEL NORMAN,

                Appellant.

No. 83330-8-I

DIVISION ONE

UNPUBLISHED OPINION

COBURN, J. — Atere Norman appeals his conviction of assault in the second degree because the court dismissed a deliberating juror and replaced him with an alternate. The juror had punched himself in the face because of stressful disagreements during deliberations but said he did not think it would happen again and wanted to continue deliberating. A new trial is warranted because the trial court dismissed the juror on grounds not supported by the record, and because there is a reasonable possibility that the dismissal stemmed from that juror's view of the merits of the case. Accordingly, we reverse and remand for a new trial.

## FACTS

In January 2020, Norman was on trial for burglary in the first degree and assault in the second degree. On the first day, the case was submitted to the

Citations and pin cites are based on the Westlaw online version of the cited material.

jury, and deliberations began right after lunch. At 3:30 p.m., the court heard loud pounding on the door. The jurors told court staff that they were breaking for the evening and they would be back at 8:00 a.m. the following day. When the court clerk entered the jury room, five jurors were still departing. They asked the clerk what they should do if they have a problem with one of the jurors, and the clerk responded that the presiding juror should contact the clerk privately about it in the morning.

That night, the court received two phone calls about Juror 9 from two separate jurors who were not the five jurors the clerk spoke with earlier. The next day, the clerk explained both phone calls, as well as an additional conversation with the presiding juror, to the parties in court. Juror 11 had called the clerk advising that there was an incident in the jury room that afternoon and the clerk responded by saying she would speak to the presiding juror about it the following morning. The clerk further explained:

> Then Juror Number 2 left a message that said Juror Number 9 became overwhelmed and frustrated and started punching himself in the face and said that he has a problem with inflicting self-harm, and she said it was very scary and she didn't want to be sitting next to him or really in the room with him.
> Then this morning, the presiding juror contacted me and indicated that Juror Number 9 was accused of not being open-minded, then began -- then he punched himself in the face twice and made several of the other jurors uncomfortable and also said that Juror Number 9 stated he has a problem with inflicting self-harm.

The State asked the court to excuse Juror 9 for cause. Defense counsel requested to first hear from Juror 9.

2

The court inquired with Juror 9 in the courtroom outside the presence of the other jurors. The court explained, "So we've called you here today to tell us about anything unusual relating to your actions yesterday and your ability to perform your duties." The court cautioned, "Please do not tell us anything about the case." Juror 9 replied:

> So yesterday, discussions became very heated, and how would I describe – and there were a number of people who had disagreements with me. This caused raising of voices, and I became -- and I'd say it's just, I was somewhat overwhelmed. I felt somewhat like -- a little bit attacked, and I reacted with an emotional outburst of punching myself in the face. That has happened in the past when I get into high-stress situations. I have self-harmed in the past, but it hasn't happened in a number of years. That being said, I still consider myself of sound mind and ability to continue going forward with this case.

The court asked Juror 9 if he had ever in situations of high stress turned that emotion on others rather than harming himself, to which Juror 9 responded, "Outside of, like, junior high school brawls, no." The court asked if Juror 9 believed that there was any reason for any of the other jurors to feel unsafe since he physically reacted to high-stress situations, and Juror 9 responded, "No. I have never become violent with another person because of one of these high-stress events. It has always resulted in self-harm."

Defense counsel asked Juror 9 if he saw this happening again. Juror 9 responded:

> I do not think so. I am -- I'm going to -- I've tried to basically ready myself and steady myself. And this was -- now that I know that -- how stressful the situation can get, I'm more prepared to handle and deal with it, and if I feel like it is getting to that point again, I will simply ask the jury for a break and take a small break and cool down so it doesn't occur again.

3

The State renewed its motion to dismiss Juror 9. The defense requested to hear from the jury foreman "to maybe speak on behalf of the jury." The court then inquired with Juror 2 and then Juror 8, who was the presiding juror. The following exchange took place:

> THE COURT: So I want to caution you not to tell me anything about anything that was said or -- anything that was said in the jury room or anything about the case, but I know you left a message yesterday, and part of the message told us what you saw, and we're aware of that. So I want to know from you how you're feeling or what your thoughts are about going forward.
>
> JUROR NO. 2: I'm fine to continue going forward. I just don't want that to -- I don't want the incident that happened yesterday to limit what people feel comfortable saying so we don't have a repeat of that, just because --
>
> THE COURT: So just tell me how it made you feel and how you think that may affect you?
>
> JUROR NO. 2: I just -- it made me feel uncomfortable because I don't like seeing someone respond that way to things that are happening. I – I do want to continue to move forward. I just -- I just don't want a repeat of what happened yesterday to occur again.

The State followed up asking, "Was there anything about [Juror 9's] behavior that might cause jurors not to speak their opinions?" Juror 2 responded:

> I think so, yes, just because nobody wants to see him do that again, and I think everybody is a little on edge just a little bit just because they're not quite sure what—how he's going to react to certain things that are said and if he is potentially going to have another incident like that again.

Defense counsel followed up asking, "Are you saying that this would hinder your ability to speak your mind?" Juror 2 replied:

4

It would not hinder my ability. I have no issues with coming forward and sharing how I feel about it, and I don't think anybody is having any issue. They just don't want a repeat. They just don't want to see him punch himself in the face again. They don't want to see him as if he is about to break out into tears, and we're just – we're just more concerned with his behavior versus the nature of our conversations and the things that are being said.

The defense followed up with the question, "[W]hat was the vibe in the room?"

Juror 2 said:

It's very -- we're just not sure what to expect. That's really what it is, and we haven't discussed anything, but you can just tell. You know, we just kind of scan around and we're just not really sure what today is going to hold for us in terms of that person's behavior."

The court explained that the jury had not been allowed to continue deliberations.

The court then inquired with Juror 8, the presiding juror.

THE COURT: Mr. Presiding Juror, first I'd like to caution you that we don't want to hear anything about your deliberations or anything about your factual discussions of the case. But we are aware, from Juror Number 9 himself as well as a report from at least one or more other jurors that he became overwhelmed and started punching himself in the face yesterday. And our question to you is whether or not you believe the jury will be able to fully and fairly discuss these matters based on that incident and whether or not you have any concerns for his, your, or anyone else's safety and health.

JUROR NO. 8: There was some disagreement. I don't think that there is any physical threat, but there was some physical – self physical punching of the face by Juror Number 9, and he stated that he had problems with self-harm growing up. Now, because of the disagreements, I'm not sure that that won't continue. I'm not sure that there will be a resolution. He was pretty adamant about his beliefs, so I don't know that we'll be able to come to an agreement. In fact, I don't think we will.

THE COURT: Well, I don't want to hear about that. Sorry.

JUROR NO. 8: Okay. Okay.

5

THE COURT: What I want to know is whether there will be a full and fair discussion and without intimidation from anybody feeling --

JUROR NO. 8: No.

THE COURT: No.

JUROR NO. 8: I don't think there will be.

Defense counsel followed up and asked, "What do you mean?  And I know the question generally and I know the answer, but how do you see this playing out?  Do you think people will not be able to openly discuss or give their views on it?"  Juror 8 responded as follows with a question interjected by the court:

JUROR NO. 8: I think they will be able to give their views openly, sure. Yes.

THE COURT: So they won't be inhibited by --

JUROR NO. 8: No, I don't -- no. No. I must have misunderstood the question. No, I don't think any of the other jurors will be inhibited.

The State followed up.  The following exchange took place:

[STATE]:  Is it your opinion that Juror Number 9 is not allowing other people to have their opinions?

JUROR NO. 8: He is.

[STATE]:  He is allowing them.

JUROR NO. 8:  He is allowing, but oftentimes, he's interrupted during those opinions.  That was the course that was taken yesterday.

[STATE]:  And did he seem in control of himself during the course of deliberations?

JUROR NO. 8:  Probably 80 percent of the day, yeah.

6

> [STATE]:  What about the other 20 percent?
>
> JUROR NO. 8: Well, it led to him punching himself in the face a couple times and grabbing his hair.  He apologized every time, so maybe he was remorseful about it.
>
> [STATE]:  Are you concerned about his well-being?
>
> JUROR NO. 8:  Well, I'm -- yeah.
>
> [STATE]: You said that discussions were contentious; is that correct?
>
> . . .
>
> JUROR NO. 8: Yes.
>
> [STATE]:  And do you feel that's what led to his reaction?
>
> JUROR NO. 8: Yes.
>
> [STATE]:  And do you expect that that is going to continue or could – or could continue?
>
> JUROR NO. 8:  Well, it could.  I don't know Juror Number 9 well enough to know whether he's able to keep himself in check.  I -- I -- I would hope it didn't happen again.

Defense counsel followed up asking, "[A]s you sit here now, are you willing to go in there and move forward and see how it plays out?  Are you comfortable with that?"  The presiding juror responded, "Yes, sure."

The court did not inquire with any other juror.  The State again asked the court to excuse Juror 9 for cause.  Norman disagreed. The court replaced Juror 9 with an alternate juror.  The court explained its ruling:

> I'm going to dismiss Juror Number 9.  Twenty percent of the day, he was not in control of himself, and he apparently has a long history of self-harm when he's overwhelmed, highly stressed, and not in control of himself.  And I don't doubt that he'll make his best efforts, but being out of control and punching yourself in the face

has to be intimidating on the process of discussing your views openly and freely. . . . [Juror 2] said that she -- you know, felt bad that he was hitting himself in the face and didn't want him to do that, and I think that shows an inhibition at some level. So that's what we'll do. We'll call Juror 13. We'll tell the jurors that they won't be deliberating until Juror 13 arrives, and hopefully that won't be too long.

The court called in the alternate juror, Juror 13, and instructed the jury to disregard all previous deliberations, begin deliberations anew, and to not discuss the excused juror in any respect. That same afternoon the jury returned its verdicts, finding Norman not guilty of burglary in the first degree and guilty of assault in the second degree.

Norman appeals.

## DISCUSSION

Norman contends that the trial court violated his due process right to a fair and impartial trial under the federal and Washington constitutions because it dismissed Juror 9 during deliberations after he had an emotional outburst that stemmed from other juror's pressure to change his views on the merits of the case. The State counters that the dismissal was proper because Juror 9's conduct of punching himself in the face and pulling his hair was incompatible with proper and efficient jury service and that the juror was not dismissed because of his views on the merits of the case.

Our Supreme Court has interpreted article I, section 21 of the Washington Constitution to guarantee criminal defendants the right to a unanimous jury verdict. State v. Ortega–Martinez, 124 Wn.2d 702, 707, 881 P.2d 231 (1994). Both the federal and Washington constitutions guarantee criminal defendants the right to a trial by an impartial jury. U.S. CONST. amend. VI; WASH. CONST. art. I, §

8

22. However, the defendant "has no right to be tried by a particular juror or by a particular jury." State v. Gentry, 125 Wn.2d 570, 615, 888 P.2d 1105 (1995). Further, RCW 2.36.110 provides:

> It shall be the duty of a judge to excuse from further jury service any juror, who in the opinion of the judge, has manifested unfitness as a juror by reason of bias, prejudice, indifference, inattention or any physical or mental defect or by reason of conduct or practices incompatible with proper and efficient jury service.

This statute places a "continuous obligation on the trial court to excuse any juror who is unfit and unable to perform the duties of a juror." State v. Jorden, 103 Wn. App. 221, 227, 11 P.3d 866 (2000).

However, dismissal of a holdout juror implicates the defendant's rights to both an impartial jury and a unanimous verdict. State v. Berniard, 182 Wn. App. 106, 119, 327 P.3d 1290, 1297 (2014) (citing State v. Elmore, 155 Wn.2d 758, 771-72, 123 P.3d 72 (2005)). Doing so also may give the reconstituted jury the "impression that the trial judge prefers a guilty verdict." Berniard, 182 Wn. App. at 119 (citing Elmore, 155 Wn.2d at 772). "Each of these dangers may arise if a juror is disqualified due to distress arising from holdout status." Berniard, 182 Wn. App. 119-20.

The appropriate standard to apply in reviewing a trial court's dismissal of a juror depends on the nature of the request for the dismissal. Berniard, 182 Wn. App. at 118. Generally, as long as the trial court applied the correct evidentiary standard, this Court reviews the dismissal of a juror for abuse of discretion. Elmore, 155 Wn.2d at 778. "Discretion is abused when the trial court's decision is manifestly unreasonable, or is exercised on untenable grounds, or for

untenable reasons." State v. Blackwell, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993). A trial court "acts on untenable grounds 'if its factual findings are unsupported by the record,' and acts for untenable reasons 'if it has used an incorrect standard,' and its decision is manifestly unreasonable 'if its decision is outside the range of acceptable choices given the facts and the legal standard.'" Berniard, 182 Wn. App. at 118 (citing State v. Rundquist, 79 Wn. App. 786, 793, 905 P.2d 922 (1995). The question of whether the proper standard of proof was applied by the trial court is a question of law subject to de novo review. Elmore, 155 Wn.2d at 768-69.

The applicable standard of proof changes, depending on the circumstances, when a trial court is investigating a deliberating juror's alleged misconduct and is aware that the juror in question holds a minority view on the merits. See Elmore, 155 Wn.2d at 758; Berniard, 182 Wn. App. at 118; State v. Depaz, 165 Wn.2d 842, 854, 204 P.3d 217 (2009).

Our Supreme Court in Elmore held that "in the rare case where a deliberating juror is accused of attempting jury nullification," "in analyzing the evidence obtained from investigation, the trial judge must apply a heightened evidentiary standard: a deliberating juror must not be dismissed where there is any reasonable possibility that the impetus for dismissal is the juror's views of the sufficiency of the evidence." 155 Wn. 2d at 761.

> A discharge stemming from a juror's doubts about the sufficiency of the evidence would violate the right to a unanimous jury verdict because it "would enable the government to obtain a conviction even though a member of the jury that began deliberations thought that the government had failed to prove its case."

10

Elmore, 155 Wn. 2d at 771 (internal quotation marks omitted) (quoting Sanders v. Lamarque, 357 F.3d 943, 945 (9th Cir. 2004).

> [W]here a trial court concludes that there is a reasonable possibility that the impetus for removal of a deliberating juror is disagreement with the juror's view of the sufficiency of the evidence, the trial court must send the jury back to deliberate with instructions that the jury continue to try to reach a verdict. Otherwise, the defendant is entitled to a mistrial.

Elmore, 155 Wn. 2d at 772 (citing United States v. Symington, 195 F.3d 1080, 1085-86 (9th Cir.1999)).

In Depaz, the Supreme Court rejected the opportunity to extend Elmore, and "expressly reserved the 'reasonable possibility' standard for cases involving accusations of nullification and refusing to deliberate or follow the law." 165 Wn. 2d at 855. The trial court in Depaz dismissed a deliberating juror after she called her husband and shared that she was in the minority view in a case that rested on circumstantial evidence and that she would continue to persuade others of her view. Id. at 859.

The Supreme Court reasoned that investigating that type of allegation would not "necessarily require investigation into the jury's deliberation," because "the trial court did not have to evaluate her views of the case in order to determine whether she communicated with a third party or received extrinsic information about the case." Depaz, 165 Wn.2d at 854-55. The Supreme Court rejected the proposition that RCW 2.36.110 permits the trial court to remove a juror simply for engaging in misconduct. Id. at 855. The Depaz court reasoned, "While a finding of misconduct relates to 'conduct or practices incompatible with

11

proper and efficient jury service,' it does not fully reflect that a juror has manifested unfitness to serve on the jury as required under RCW 2.36.110." Depaz, 165 Wn. 2d at 856. The Supreme Court reversed the conviction and held:

> [W]here the trial court has knowledge of a deliberating juror's substantive opinion of the case, trial courts must make a determination regarding prejudice. Prejudice should be determined by concluding whether any misconduct committed by the juror has affected the juror's ability to deliberate before deciding to excuse the juror under RCW 2.36.110.

Depaz, 165 Wn.2d at 857.

This court has applied the heightened "reasonable possibility" standard to circumstances where the dismissed juror exhibited a high level a stress because of disagreements regarding merits of the case during deliberations. See State v. Johnson, 125 Wn. App. 443, 457, 105 P.3d 85 (2005); Berniard, 182 Wn. App. at 122.

The heightened "reasonable possibility" standard is used " 'where a request for juror dismissal focuses on the quality of a juror's thoughts about the case and his ability to communicate those thoughts to the rest of the jury.' " Berniard, 182 Wn. App. at 118 (quoting Elmore, 155 Wn.2d at 775). Under this standard, "[w]here there is a reasonable possibility that the impetus for the complaint is the juror's views on the merits, 'the trial judge has only two options: send the jury back to continue deliberating or declare a mistrial.' " Berniard, 182 Wn. App. at 119 (quoting Elmore, 155 Wn.2d at 776).

In Johnson, the trial court removed a juror because it found she was incapable of deliberating with the other members of the jury. 125 Wn. App. at

458. The trial court stated that it based its determination on the presiding juror's testimony that the other juror was "emotionally distraught and had been crying a lot, she frequently retreated to the corner where she would cease communicating with the other members of the jury, and that her condition was worsening and impeding on the deliberations process." Id. The dismissed juror told the court that she had been crying and was upset because she took a different view of the jury instructions and how the presiding juror was conducting deliberations. Id. at 459. The record demonstrated that the juror disagreed at least in part because she had different views regarding the merits of the case, and "[she] did not indicate at any time that she was unable to proceed due to unrelated health or emotional concerns or that she was unable or unwilling to participate in the deliberations process." Id.

Relying on Elmore, the Johnson court concluded that the trial court "improperly intruded into the jury deliberations, becoming in essence a thirteenth and presiding juror to rule on what the jurors said during deliberation" by finding the presiding juror credible and the other juror not credible. Id. at 459 (citing Elmore, 121 Wn. App. at 757). The Johnson court held that the trial court violated the defendant's constitutional rights when it removed the juror and reasoned that "the record discloses a reasonable probability that [the dismissed juror] had questioned the sufficiency of the State's case—even if she had at times retreated from deliberations." Id.

Johnson was decided before Depaz, but later the Berniard court demonstrated why Depaz actually supported its application of the heightened

"reasonable possibility" standard despite the fact the juror in Berniard was not accused of engaging in nullification, refusing to deliberate, or refusing to follow the law. Berniard, 182 Wn. App. at 120.

In Berniard, a deliberating juror, while getting her parking validated, burst into tears and told the jury administrator she thought she could do jury service, but it had been stressful for her. Id. at 113. The jury administrator explained the court had a service that could assist the juror and gave her the contact information for Judy Snow, a jury debriefer. Id. Snow explained to the court that when the two connected by phone the next morning, the juror said she felt like she could harm herself, and that if it got to the point that she had to continue on like this, she could do serious damage to herself. Id. at 113-14. Snow explained to the juror that if it was traumatic, she was there to support her. Id. at 114. That same afternoon, the juror told Snow in person that she felt better after talking with her and that she did not think she "could hurt herself, actually hurt herself." Id. at 114. The juror said she was fearful that all the jurors would be against her and that the jury process was very traumatic for her. Id. at 114. Snow explained that the juror said she felt much more optimistic that there would be a jury debriefer after deliberations. Id. at 114. Snow also explained that although the juror had been crying rather hysterically on the phone, when they talked in person, "[s]he was continuing to cry, but felt that this was a very difficult decision-making process to be on a jury of such magnitude and that she was feeling that she could continue." Id. at 115. The trial court denied the defense's request to inquire if the juror's distress resulted from being in the minority, and instead,

14

dismissed her as unfit because of her "unstable mental and emotional condition."

Id. at 115.

The Berniard court applied the heightened "reasonable possibility" standard because the circumstance, unlike that in Depaz, *did* risk investigation into the jury's deliberation. Id. at 123. The Berniard court held that the trial court erred in dismissing the juror without further inquiry into the cause of her complaint. Id. at 123. The court took particular note of the link between stress and holdout jurors:

> If, as argued here, the juror's emotional state that led to her dismissal arose in part from her perceived status as a minority of one, the dismissal could be characterized as arising from the juror's view of the merits. Of greater potential damage, if emotional stress tended to arise more frequently from holdout status, the unexamined dismissal of a juror for that stress could unintentionally cull holdout jurors.

Id. at 118. The court noted that Snow's testimony established that replacing the juror implicated the quality and coherence of the juror's views on the merits and raised a reasonable possibility that the juror's distress arose from disagreement on the merits of the case. Under these circumstances, the Berniard court held that the trial court had a duty to conduct a balanced investigation and apply the heightened evidentiary standard. Id. at 123.

The instant case is more analogous to Johnson and Berniard than Depaz.

We first examine if the record supports the basis for which the trial court dismissed Juror 9. The State argues that Juror 9's "personal challenges prevented him from fulfilling the duties of a juror." Nothing in the record indicated that Juror 9 would not or could not fulfill the duties of a juror. The presiding juror

explained that Juror 9's physical response was a reaction in response to contentious deliberations but was able to apologize to the other jurors afterward. Juror 9 explained that his outburst was in reaction to heated disagreements with him where he felt "a little bit attacked." He recognized this self-harm was a response to a high-stress situation. The presiding juror explained that Juror 9 was allowing other people to express their opinions but that Juror 9 was oftentimes interrupted. The record establishes that Juror 9's self-harm did not prevent him from participating; it was a reaction to the contentious deliberations. Juror 9 explained to the court that now that he was aware that this reaction could occur, he did not think it would happen again as he was more prepared to handle it and deal with it, including asking the jury for a small break to cool down if needed.

Contrary to the State's characterization, the trial court did not dismiss Juror 9 because it found he could not fulfill his duties as a juror. The trial court was more concerned about whether his self-harm impacted the process of discussing views openly and freely. The trial court noted that Juror 9 was not in control of himself 20 percent of the day. Despite stating "I don't doubt that he'll make his best efforts," the trial court found that "being out of control and punching yourself in the face has to be intimidating on the process of discussing your views openly and freely." The evidence the trial court relied on to support that conclusion was the fact that Juror 2 "felt bad that [Juror 9] was hitting himself in the face and didn't want him to do that, and I think that shows an inhibition at some level."

16

First, Juror 9 was not out of control 20 percent of the day. It appears the trial court grasped onto the presiding juror's response to the State asking if Juror 9 seemed in control during the course of deliberations. Juror 8, the presiding juror, answered, "Probably 80 percent of the day, yeah." When the State asked about the other 20 percent, the presiding juror responded, "Well, it led to him punching himself in the face a couple times and grabbing his hair. He apologized every time so maybe he was remorseful about it." The jury deliberated from after lunch until about 3:30 p.m. on the day of the incident. Why the jury chose to recess at 3:30 p.m. is not in the record.[1] Juror 8's answer to the State suggests that the 20 percent of the couple of hours of deliberation included events that "led to" Juror 9's physical response.

More importantly, as to whether Juror 9's outburst would inhibit other jurors from deliberating openly and freely, Juror 8 said, "I think they will be able to give their views openly, sure. Yes," and, "No, I don't think any of the other jurors will be inhibited." The trial court also disregarded Juror 2 when she clarified her answers regarding how Juror 9's conduct could impact her ability to speak freely. The defense counsel asked, "Are you saying that this would hinder your ability to speak your mind?" Juror 2 replied:

> It would not hinder my ability. I have no issues with coming forward and sharing how I feel about it, and I don't think anybody is having any issue. They just don't want a repeat. They just don't want to see him punch himself in the face again. They don't want to see him as if he is about to break out into tears, and we're just – we're

---

[1] The trial court instructed the jury before deliberations began that they could decide when to take breaks for lunch and when to go home for the day with the understanding they could only be in the building when the courthouse was open.

17

just more concerned with his behavior versus the nature of our conversations and the things that are being said.

It is undisputed that Juror 9's self-harm was extremely unusual and the record indicates that Jurors 2 and 8 were concerned about Juror 9's well-being. The trial court checked in with Juror 9, who was able to explain why it happened, that he did not think it would happen again, that he had a plan to manage it, and that he was of "sound mind" and able "to continue going forward with the case."

The trial court was aware that five other jurors also asked the clerk about what to do if there was a problem with a juror. However, the trial court did not inquire with any other jurors. The trial judge dismissed Juror 9 on grounds not supported by the record.

We next turn to the heightened "reasonable possibility" standard. The State argues that the heightened "reasonable possibility" standard does not apply because the complaints from the other jurors stemmed solely from Juror 9's actions and behaviors and not because of his views on the merits of the case. However, in Berniard, the concern about the juror was raised by the jury debriefer who was concerned about the juror's emotional state and was not even part of the jury. Berniard, 182 Wn. App. at 113-15. And in Johnson, it was the juror herself who initially asked to be dismissed. Johnson, 125 Wn. App. at 451. How the trial court learns about the stressed juror is less important than the court's awareness that there is a reasonable possibility the stress arose from the juror's view on the merits of the case.

In the instant case, the trial court was aware that Juror 9's outburst stemmed from stress directly associated with contentious deliberations where

18

several jurors disagreed with Juror 9, there were raised voices, and he felt attacked. Juror 8, the presiding juror, also alerted the trial court that Juror 9 "was pretty adamant about his beliefs, so I don't know that we'll be able to come to an agreement. In fact, I don't think we will."

Juror 9, like the dismissed jurors in Berniard and Johnson, had an extreme reaction to the stressful deliberation process where the trial court was aware that there was a reasonable possibility that the stress arose from the juror's views on the merits of the case. The trial court dismissing Juror 9 under these circumstances violated Norman's right to a unanimous verdict. Also, the removal may have suggested to the reconstituted jury that the court preferred guilty verdicts, violating Norman's right to an impartial jury.

CONCLUSION

The remedy for improper dismissal of a deliberating juror is reversal and remand for a new trial. Berniard, 182 Wn. App. at 124 (citing Elmore, 155 Wn.2d at 781). The trial court dismissed a deliberating juror assuming his outburst "has to be intimidating on the process of [jurors] discussing [their] views openly and freely." This was an abuse of discretion because the basis for the dismissal was not supported in the record and, thus, based on untenable grounds. The trial court also violated Norman's constitutional right to a unanimous verdict and impartial jury when it removed the deliberating juror where there was a reasonable possibility that the juror had questioned the sufficiency of the State's

evidence.

Accordingly, we reverse and remand for a new trial.

_____ Cohen, J.

WE CONCUR:

_____

_____ Mann, C.J.