IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION TWO

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 51174-6-II |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JOSEPH L. EDWARDS, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — After a guilty verdict from the jury trial, the trial court convicted

Joseph Edwards with seven crimes: two counts of robbery in the first degree, three counts

of burglary in the first degree, and two counts of assault in the second degree. On appeal,

this court affirms all but two of Joseph Edwards' seven convictions. We remand for the

trial court to vacate count 3, the burglary conviction for entering the Salzman home, and

either count 4 or 5, the burglary convictions stemming from the entry of the Collazo

house. We also remand for the trial court to strike challenged fees.

FACTS

This appeal involves two discrete October 28, 2016 home invasions that occurred

hours apart in Kelso. The first home trespass occurred at the Salzman residence, while a

second occurred at the Collazo house.

Salzman Home Invasion

Alexander and Heather Salzman slept at their home in Kelso during the early morning of October 28, 2016. Alexander's mother slept in a motor home outside of the residence with the couple's three-year-old child. At 3 a.m., Alexander awoke to his dog growling and a knock at the front door. Before answering the door, he pushed a curtain aside and viewed a woman he did not recognize. The woman was Mescha Johnson. Alexander asked Johnson if she needed help, and she replied that someone tried to injure her. Alexander let Johnson inside, closed the door, and locked it. Thereafter, Heather entered the dining room and allowed Johnson to use her cell phone to make a call.

Another woman came to the door. Heather assumed the new woman at the door was Mescha Johnson's friend, so Heather let her inside the residence. Seconds later, two masked men barged into the house. One of the two masked men, a Caucasian, wore red shoes, baggy pants, a hoodie, and a red bandanna across his face. This man secreted his hands underneath his sweatshirt simulating as if he held a pistol in his waistband. The second masked man, a tall and thin African-American, wore a hoodie, a Seahawks hat, and a black ski mask with the eyes and mouth exposed. The State claimed this second masked man to be Joseph Edwards. Mescha Johnson and Joseph Edwards, nicknamed New York, shared a child together.

2

Alexander Salzman noticed that the taller African-American man had metal dental work. He wielded a bright yellow and gray crowbar type object, which appeared to be a nail puller. At first, the man held the weapon in a threatening manner. He later concealed the bar under his sleeve. Salzman could discern the intruder's skin tone. The two masked intruders demanded to see a man named Michael Woods, who apparently owed them $10,000. Alexander denied knowing anyone by that name and explained to the intruders that he did not have $10,000. The taller man with the gloves saw Alexander's wallet on a nearby cabinet and pocketed it. Alexander offered the burglars his iPhone. Both of the masked men accompanied Alexander into the bedroom to retrieve his cell phone. All four intruders left the residence seconds later with Alexander's cellphone and wallet, as well as Heather's cellphone.

Law enforcement officers went to the Salzman residence. Police collected a latex glove discarded on the side of the road near the Salzman home.

Collazo Home Invasion

Jessica Collazo, her husband Alexander Collazo, and their five children also lived in Kelso. On October 28, 2016, Alexander and Jessica awoke to find three masked intruders, two women and one man, rushing into the bedroom. One burglar struck Jessica in the head, causing her to bleed.

The male intruder stood at the foot of the Collazos' bed and repeatedly struck Alexander with a crowbar. The attacker repeated: "Give me everything; give me

everything." Report of Proceedings (RP) (July 12, 2017) at 156. Jessica rushed toward one of the women and grabbed her arms. She ripped the mask off the woman and recognized her as Mescha Johnson. Johnson previously lived with the Collazos. Johnson was familiar with the contents of the Collazo household and therefore knew a firearm rested in the closet. As the struggle continued, Johnson entered the closet. Johnson grabbed the gun, and Jessica and Johnson tussled over the weapon. Johnson yelled: "New York," and the masked man bashed Jessica again with the crowbar. When the man turned to hit her, his mask fell to his neck, and Jessica recognized him as New York. She also recognized the man's voice.

Alexander unlatched their bedroom window and jumped through the window. The man and the other woman followed Alexander out the window, while Johnson remained behind. Emergency providers rushed Alexander to the hospital by ambulance, where he remained for one month. Jessica later discovered two of her laptops and other electronics to be missing from the house.

Heather Delagasse lived directly across the street from the Collazo family. After bidding her children goodbye for school, Delagasse saw one male and two females, running from the alley behind the Collazo's house and onto the Collazo's front porch. RP 172-73. Delagasse recognized one of the women as Mescha Johnson and the lone man as "Joe" Edwards, both of whom she had previously met. When Edwards spoke to Johnson, Delagasse noticed that Edwards had gold teeth.

Heather Delagasse went inside her house to call Alexander Collazo. He did not answer. When Delagasse returned outside, she saw a bloody Alexander stumbling in the middle of the street and heard him yelling for help. Delagasse called the police.

Kelso Police Department Detective Craig Christianson responded to the Collazo home on October 28, 2016. He saw both Alexander and Jessica Collazo covered in blood. Detective Christianson detained Mescha Johnson, who remained at the residence. While on his way to the Kelso Police Department with Johnson for questioning, Johnson showed Christianson her parked car and gave him consent to search it. Police collected latex gloves from the vehicle's backseat and the door pockets. Two gloves found in the backseat of Johnson's car contained Joseph Edwards' DNA. Detective Christianson found, inside the car, an identification card belonging to Kelsie Lee in a backpack. Kelsie Lee was Edwards' recent girlfriend. Police seized other latex gloves located on the Collazo lawn and inside the home.

On October 31, 2016, a Washington court issued arrest warrants for Joseph Edwards and Kelsie Lee. On November 9, 2016, Ohio State Trooper Joshua Smith stopped a car driven by Edwards for going 103 m.p.h. in a 70 m.p.h. speed zone. Lee was a passenger in the vehicle. Edwards initially gave Trooper Smith a false name, but later admitted to providing false information because he wanted to avoid going to jail on outstanding warrants. Trooper Smith arrested Edwards pursuant to the outstanding Washington State warrant. Washington extradited Edwards and Lee back to Washington.

PROCEDURE

The State of Washington charged Joseph Edwards with seven crimes: two counts of robbery in the first degree, three counts of burglary in the first degree, and two counts of assault in the second degree. The State charged deadly weapon enhancements for all seven charges. Count one of the information alleged robbery by reason of taking Alexander Salzman's wallet and cellphone by force. Count two alleged robbery by reason of taking Heather Salzman's cellphone by force. Count three alleged burglary of the Salzman home. Count 1 and count 2 of the information, the first degree robbery charges, contained identical language and alleged only the alternative that the defendant or an accomplice "was armed with a deadly weapon other than a firearm," while citing RCW 9A.56.200(1)(a)(i). Clerk's Papers (CP) at 11. The information did not allege alternatively that Edwards displayed what appeared to be a deadly weapon.

Count four in the information alleged that Joseph Edwards committed burglary of the Collazo home while assaulting Alexander Collazo. Count five alleged burglary of the Collazo home while assaulting Jessica Collazo. Count six alleged an assault on Jessica Collazo, while count seven alleged an assault on Alexander Collazo.

Before trial, the State moved in limine, under ER 801(d)(2)(v), for admission of statements by Kelsie Lee uttered to Mescha Johnson after both women were arrested and incarcerated. The State also sought to admit two letters Lee purportedly wrote to Joseph Edwards while both sat in jail. Joseph Edwards objected to the admission of the oral

6

statements and the letters. The State argued that Lee's statements and letters did not constitute hearsay because Lee rendered the comments as a co-conspirator during the course and in furtherance of conspiracy.

The trial court ruled admissible Kelsie Lee's oral comments to Mescha Johnson and her letters to Joseph Edwards. The court found Lee to be a co-conspirator and reasoned that the conspiracy in this case continued after the commission of any alleged crime. The trial court noted that Lee spoke to Johnson about refusing to cooperate with the State and refusing to speak to law enforcement in order to avoid convictions.

During jury selection, counsel and the trial court questioned prospective jurors on the record in the courtroom. The trial court reserved for-cause challenges until a sidebar conference at the end of voir dire. On completion of jury questioning, the court invited the attorneys to the bench to exercise juror challenges. The court did not dismiss the jury from the courtroom. The parties exercised juror challenges at a sidebar for twenty-two minutes. The sidebar was not contemporaneously recorded or reported on the record. Following the sidebar, the trial court read in open court the excused jurors' names and numbers. The court then read the numbers of the thirteen empaneled members of the jury.

The trial court filed a written struck juror list on the day of completion of jury selection. The list included a code with "Pla" for the State's peremptory challenges, "Def" for the defense peremptory challenges, "Cs" for for-cause challenges, "NR" for not

reached, "Sw" for sworn jurors, and "Alt" for alternate jurors. According to the struck juror list, the trial court granted twelve for-cause challenges. The list did not specify which party exercised which for-cause challenge, nor did the list disclose the basis for each challenge. Neither the clerk's minutes nor the struck juror list elucidated whether the trial court denied any for-cause challenges.

At trial, the prosecution showed Heather Salzman two photographs, each of a cellphone recovered from Joseph Edwards' wife, Yolanda Edwards. Heather identified one phone as her cellphone and the other as Alexander's cellphone, and she declared that, when police showed her the recovered phones, she unlocked both using a passcode. Alexander Salzman likewise identified, at trial, the two recovered iPhones as belonging to Heather and him.

Mescha Johnson testified during the State's case. Johnson admitted that she told police that the man involved in the home invasion at the Collazo home went by the name "Shameek." She used the name Shameek in her written statement to police.

Mescha Johnson also testified that, in late November 2016, following her arrest, she saw Kelsie Lee at the Cowlitz County Jail. Johnson testified that Lee told her that, after the Collazo burglary, Lee and Joseph Edwards stole a car and drove to Seattle to Edwards' wife's house. According to Johnson, Lee told Johnson that she and Edwards brought the Salzman's stolen phones with them and left the phones at Yolanda Edwards'

8

house.  Lee also told Johnson, in an intimidating manner, that the two needed to keep their stories straight and stick together.

At the State's request, the trial court admitted three jail letters, one purportedly from Joseph Edwards to Mescha Johnson and two from Kelsie Lee to Edwards, both sent after the arrest of all three.  Jail staff found the letters in Edwards' cell.  In Edwards' letter to Johnson, he wrote

> 48 months is really not that long. . . .  But me, I'm going straight to prison . . . .  I'll be gone for at least 11 yrs.

Ex. at 47.

In Kelsie Lee's first letter, dated February 8, 2017, she commented that she and Edwards should write in code and stated: "listen we have to make sure your [sic] still married to Yolanda @ trial."  Ex. at 46.  Lee also wrote about fashioning a different story of how the pair received the cell phones.  Ex. at 46.  We do not know if Lee wrote the letter on a date other than February 8.

In Lee's second letter, an undated letter, she begged for Edwards' advice after being told by the trial court she would receive the maximum sentence if she did not reveal the identity of the fourth participant in the Salzman burglary.  Ex. at 48.  We do not know the date on which Lee wrote the second letter.

When the trial reconvened the morning following the resting by both sides, the trial court informed the parties that juror 11 went to the hospital after suffering an anxiety

attack and seizure. The bailiff then alerted the court, in the presence of Joseph Edwards

and counsel, that juror 10 wished to speak privately with the court. The court called juror

10 into the courtroom for a discussion. The juror asked the court to speak in private,

which request the court refused.

The following colloquy occurred between juror 10 and the trial court:

> JUROR: I've either had in the past a dream or a memory of this case.
> THE COURT: All right.
> JUROR: I believe I received a phone call from my brother within the past two years where he asked me to come to his house and help him move some goods that he had. It was in the morning. I don't remember—I remember arriving and was nervous. My brother lives in South Kelso. And as I came to [the] house to help me [sic], and I thought he had some boxes that were in the street that needed to be moved or something akin to that.
> THE COURT: Uh-huh.
> JUROR: I don't know. Anyway, as I came there, a fellow came riding up on a bike and I hadn't remembered anything about this until there was a discussion about a fellow riding on a bike, but it was a fellow that had tattoos on his hands and he was talking to my brother and said—they were discussing and didn't want me to hear, and so eventually he came over and there was a discussion about possibly somebody needed to change their ID or something, and he's got tattoos on your hand, you need to have your hands removed because it's obvious that somebody could identify you from that.
> And there was a little more discussion about—with him and my brother and then he rode down the road and my brother said, well, I don't need you anymore, and I left.
> And I only brought that up because I felt that now my—I'm clouded with this thinking that perhaps I'm involved somehow with this case.
> THE COURT: Okay. And you said that was sometime in the past two years or so?
> JUROR: It's been in the past. I can't remember the time. That's—you know, memory is, you know, sometimes a bad thing.
> THE COURT: Sure.

10

JUROR: But, yes, it has been within the past two years.

THE COURT: So do you feel that the man on the bike was somebody involved in this case or not?

JUROR: I believe the man on the bike was the defendant.

. . . .

THE COURT: Okay. And this memory you have, is it a distinct memory of something that actually occurred, or is it something that you mentioned that it might have been a dream?

JUROR: And that I could not swear to.

THE COURT: Okay. All right. So let me ask you this question. Whether that is a memory or an actual event, do you think that's something that you could separate and put to the side and not consider, and if thoughts about that particular episode came to your mind you could keep them off to the side and just focus on the facts that were presented during the trial?

JUROR: I believe I could, but—I could focus on the facts of the trial.

THE COURT: Okay.

JUROR: But I don't believe because I cannot tell you whether it was a dream or whether it was a reality, then I can't—I don't allow that to affect me.

THE COURT: Okay. Is it something that you would be able to control—

JUROR: Yes.

THE COURT:—and would not affect—

JUROR: I believe I could because of the nature of the memory or the dream. Because it's so faded I don't believe it will affect.

THE COURT: Do you have a feeling as to positive, negative, neutral feelings as a result of that real or dreamed interaction?

JUROR: This caused me to be nervous, but other than that I don't really have any feeling one way or the other.

RP (July 14, 2017) at 418-21.

After directing juror 10 to refrain from disclosing his remembrance or dream, the court instructed the juror to return to the jury room. Joseph Edwards then moved to exclude juror 10. The trial court denied the motion, while reasoning that the juror could

not recall whether the event was an actual memory or a dream. The court also noted that the juror indicated he could set aside any thoughts or memory of the event. The trial court concluded that the juror could remain impartial and would not share the memory with any other jurors.

The trial court next expressed a desire to excuse juror 11, who underwent the anxiety attack and seizure. In the meantime, the bailiff had spoken with hospital personnel, who indicated that juror 11 was being treated in the emergency room. Defense counsel expressed concern about excusing juror 11. After learning that sitting on a jury was the source of juror 11's anxiety, the trial court excused juror 11 based on her medical condition. Juror 10 remained on the jury and deliberated.

The trial court instructed the jury on the testimony of a co-conspirator. Jury instruction 6 read:

> Testimony of an accomplice, given on behalf of the State, should be subjected to careful examination in the light of other evidence in the case, and should be acted upon with great caution. You should not find the defendant guilty upon such testimony alone unless, after carefully considering the testimony, you are satisfied beyond a reasonable doubt of its truth.

CP at 22. The trial court's to-convict instructions for both the robbery in the first degree charges, instructions 22 and 23, contained the uncharged alternative means of committing first degree robbery:

> (6)(a) That in the commission of these acts the defendant was armed with a deadly weapon; or

12

(b) That in the commission of these acts the defendant displayed
what appeared to be a firearm or other deadly weapon.

CP at 38-41. The trial court instructed the jury that it did not need to be unanimous as to

which of the two alternatives the State had proved beyond a reasonable doubt.

The jury found Joseph Edwards guilty of all seven charged counts. The jury

entered special verdicts that found that Edwards was armed with a deadly weapon at the

time of committing the crimes that led to each of the seven convictions.

At sentencing, the State conceded and the trial court agreed that the two Collazo

burglary convictions, count 4 and count 5, violated double jeopardy and that counts 4 and

5 should be treated and punished as one offense. In calculating Joseph Edwards'

offender score, the State properly included only one of the burglary convictions.

Nevertheless, despite the ruling, Edwards' judgment and sentence still reflects the entry

of a conviction for both count 4 and 5. The trial court also exercised its discretion in

applying the burglary anti-merger statute and determined that count 3, the first degree

burglary of the Salzman residence conviction, merged into the two counts of first degree

robbery.

During sentencing, the trial court ordered Joseph Edwards to pay a $200 criminal

filing fee, a $250 jury demand fee, and a $100 DNA fee. The trial court also entered an

order imposing against Edwards $5,862.22 in extradition expenses. The trial court found

Joseph Edwards to be indigent for appeal purposes.

13

LAW AND ANALYSIS

Public Trial

Joseph Edwards first contends that the trial court violated his constitutional right to a public trial when the court reviewed and granted for-cause challenges at an unrecorded, unmemorialized sidebar. He argues that sidebars must be recorded or promptly memorialized on the record to survive a public trial challenge. The State responds that treatment of for-cause challenges at a sidebar did not entail a courtroom closure. We agree with the State that no closure occurred.

Under our state and federal constitutions, criminal defendants possess the right to a public trial. *State v. Lormor*, 172 Wn.2d 85, 90-91, 257 P.3d 624 (2011); U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. The Washington Supreme Court has created a three-part inquiry for determining if a trial procedure violated an accused's right to a public trial: (1) Did the proceeding implicate the public trial right? (2) If so, was the proceeding closed? (3) And if so, was the closure justified? *State v. Smith*, 181 Wn.2d 508, 521, 334 P.3d 1049 (2014). The accused carries the burden on the first two steps. *State v. Love*, 183 Wn.2d 598, 605, 354 P.3d 841 (2015). Joseph Edwards and the State agree that the public trial right attaches to jury selection, including for-cause and peremptory challenges. Based on *State v. Love*, 183 Wn.2d at 605-06, we agree.

Washington courts recognize a courtroom closure can occur when the court conducts a portion of a trial in a place inaccessible to spectators, usually in chambers.

14

*State v. Love*, 183 Wn.2d at 606; *State v. Lormor*, 172 Wn.2d at 93. The Washington Supreme Court and this court have issued recent opinions reviewing the conduct of sidebar discussions for the purpose of exercising juror challenges.

In *State v. Love*, 183 Wn.2d 598 (2015), the court held that a sidebar during jury selection implicated the public trial right, but did not constitute a courtroom closure. During voir dire, the trial court judge called the defense and prosecuting attorneys to the bench to discuss for-cause challenges. The court reporter recorded the brief exchange, during which the defense asked the court to excuse two jurors and the State did not object. In *Love, the* court wrote:

> Yet the public had ample opportunity to oversee the selection of Love's jury because no portion of the process was concealed from the public; no juror was questioned in chambers. To the contrary, observers could watch the trial judge and counsel ask questions of potential jurors, listen to the answers to those questions, see counsel exercise challenges at the bench and on paper, and ultimately evaluate the empaneled jury. The transcript of the discussion about for cause challenges and the struck juror sheet showing the peremptory challenges are both publicly available. The public was present for and could scrutinize the selection of Love's jury from start to finish, affording him the safeguards of the public trial right missing in cases where we found closures of jury section.

*State v. Love*, 183 Wn.2d at 607.

In *State v. Anderson*, 194 Wn. App. 547, 377 P.3d 278 (2016), questioning of jurors occurred in open court, but the defendant challenged prospective jurors for cause at a sidebar conference, and the judge dismissed those jurors. Unlike in *Love*, the trial court made no verbatim record of the sidebar and instead summarized the sidebar proceedings

on the record. This court, after remand from the Supreme Court, held no courtroom closure occurred because counsel questioned jurors in open court, courtroom attendees could observe the parties' exercise of juror challenges, and the trial court summarized the sidebar proceedings on the record and in open court. We concluded that a lack of a transcript did not necessarily render the sidebar a closure.

In *State v. Effinger*, 194 Wn. App. 554, 375 P.3d 701 (2016), the trial court, during voir dire, asked potential jurors questions regarding their ability to remain fair and impartial. The potential jurors answered these questions in open court. Many of the potential jurors either served in law enforcement or had family members in law enforcement. The attorneys then conducted voir dire. The trial court later invited the attorneys to a sidebar, during which an unreported discussion was held. After the sidebar and after asking the venire further questions, the court held another sidebar to allow the parties to exercise for-cause challenges and to excuse jurors for hardship. This second sidebar was not transcribed, but it too occurred in open court. Following the sidebar, the trial court excused, in open court, nine potential jurors. The court identified the jurors by their respective numbers. The trial court then conducted a third sidebar to allow the parties to exercise peremptory challenges. Following this final sidebar, the court announced the composition of the jury. The trial court memorialized all three sidebars on a case information sheet, which the court filed. The sheet indicated that the court excused six jurors for cause. The sheet also stated that the court excused juror 23 for

cause, although the court did not announce that result in open court. The case information sheet specified that two jurors were struck for hardship. The sheet further reflected that the court removed juror 35 because of his high number, although the court had already excused juror 35 after the second sidebar.

While relying on *State v. Love*, *Effinger* held no closure occurred when the parties struck jurors at sidebars, even though no one recorded the sidebar discussions. *Effinger* emphasized that, like in *Love*, questioning of the potential jurors transpired in open court for everyone to hear and observe. The jurors' answers to the questions occurred in open court. Moreover, as in *Love*, the trial court held a sidebar to discuss for-cause challenges, and, in both cases, court attendees could observe the sidebar. Furthermore, after the sidebars, both courts excused jurors who had been questioned in front of the public. Lastly, the trial courts read the names of some of the jurors who were excused in open court and on the record and empaneled the jury in open court.

This court, in *Effinger*, recognized that, in *Love*, the sidebar was recorded and the public would have access to a transcript of what transpired. Nevertheless, *Effinger* concluded a recording did not control whether an open court violation occurred. *Effinger* highlighted that the record preserved the reasons for the jurors' dismissals. Each of the six jurors stated during voir dire that he or she could not be impartial. Juror 13 indicated that members of her family were corrections officers, she knew the prosecutor's sister, and she believed victims of domestic violence sometimes changed their stories.

17

Accordingly, the court concluded the trial court did not violate Ryan Effinger's right to a public trial.

We deem *Effinger* controlling. As in *Effinger*, the trial court did not exclude the public from the courtroom, and the public could scrutinize the jury selection process from beginning to end. Observers could watch and hear the questions posed to the potential jurors, listen to their answers, and see counsel exercise challenges at the bench and on paper. As in *Effinger*, Joseph Edwards' trial court excused in open court jurors who had been questioned in front of Edwards and the public and declared in open court the final composition of the jury. Additionally, the trial court filed the struck juror list that showed which jurors were excused and what type of challenges were made.

As in *Effinger*, the record of Joseph Edwards' voir dire preserves the bases for the jurors' dismissals. Juror 1 said that his son had a fever seizure a couple days ago and had a doctor's appointment the next day. Juror 9 declared that property stolen from her home left her with strong feelings that would disadvantage Edwards. Juror 17 disclosed that he had surgery scheduled the next day. Juror 24 indicated that she had twice been the victim of a home burglary and that she believed she could not be impartial.

Joseph Edwards argues that the Washington Supreme Court's recent decision in *State v. Whitlock*, 188 Wn.2d 511, 396 P.3d 310 (2017) impliedly overruled *State v. Effinger* and *State v. Anderson*. The State responds that *Effinger* and *Anderson* are distinguishable from and not overruled by *Whitlock*. We agree with the State.

18

Joseph Edwards' trial sidebars did not occur in chambers. The sidebars, as in *Effinger* and *Anderson*, occurred in open court. Edwards' juror challenges occurred in open court. The public could hear the substance of the excused jurors' answers, which led to their dismissal.

Co-Conspirator Statements

Joseph Edwards next assigns error to the trial court admitting hearsay statements not made during or in furtherance of a conspiracy. He contends that the trial court erred when it admitted Kelsie Lee's remarks to Mescha Johnson and Lee's letters to Joseph Edwards because they were inadmissible hearsay. Edwards recognizes that ER 801(d)(2)(v) removes statements of a co-conspirator from the definition of hearsay when made in furtherance of the conspiracy. Edwards, however, argues that Lee rendered her comments to Johnson and wrote her letters to Edwards after the arrest of all three co-conspirators and, therefore, not in furtherance of a conspiracy.

The State argues that a conspiracy does not end after an arrest. The State contends, in the alternative, that any error was harmless in light of overwhelming evidence against Joseph Edwards. We do not address whether the comments to Mescha Johnson and the letters to Edwards were admissible, because the prodigious evidence of Edwards' guilt rendered any alleged error harmless.

Because any error in admission of Kelsi Lee's statements and letters resulted from violation of an evidentiary rule, not a constitutional mandate, we do not apply the more

19

stringent harmless error beyond a reasonable doubt standard. *State v. Howard*, 127 Wn. App. 862, 871, 113 P.3d 511 (2005). Instead, we apply the rule that error is not prejudicial unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred. *State v. Howard*, 127 Wn. App. 862, 871.

Kelsie Lee's statements were not the only evidence of Joseph Edwards' involvement in the crimes committed at the Salzman and Collazo residences. Police officer testimony revealed that law enforcement found the Salzmans' stolen iPhones at Joseph Edwards' wife's house in Seattle. A jury could infer that Edwards brought the phones to his wife.

Both Heather and Alexander Salzman testified Edwards and the masked home invader were approximately the same height, weight, and skin tone, and both had distinctive metallic teeth. Mescha Johnson testified that she, Edwards, Kelsie Lee, and another man drove to the Salzman residence in her car and Edwards rushed in demanding money. Johnson also testified that hours later, she, Edwards, and Lee drove to the Collazo residence. While there, Edwards assaulted Alexander and Jessica Collazo with a crowbar. Jessica Collazo testified that she recognized "New York's" voice and she knew that was Edwards' nickname. The neighbor across the street, Heather Delagasse, also identified Edwards as the man who entered the Collazo home with Johnson and another woman.

20

Law enforcement found two gloves, similar to those worn by the man with the crowbar, in Johnson's car near the Collazo residence, with Edwards' DNA on them. Officer testimony established that an Ohio state trooper found Edwards and Lee on the lam. Edwards own letter convicts him. While in jail, Edwards wrote a letter to Johnson stating that he was going to prison. The overwhelming untainted evidence would lead a reasonable jury to conclude Edwards was the masked robber.

### Confrontation Clause

Kelsie Lee did not testify at Joseph Edwards' trial. On direct examination, however, Alexander Salzman testified that he observed Lee in court when she pled guilty to burglarizing his home. Alexander Salzman also declared that Lee apologized to him and his wife Heather.

Joseph Edwards contends that he received ineffective assistance of counsel because his trial counsel failed to object to Kelsie Lee's out-of-court apology to the Salzmans, which testimony constituted testimonial hearsay. The State responds that counsel was not ineffective because the State did not offer Alexander Salzman's testimony about Lee's plea for its truth, but rather for identification of one of the accomplices. Thus, according to the State, the testimony did not qualify as hearsay.

To meaningfully protect an accused's constitutional right to counsel, an accused is entitled to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Courts apply a two pronged test to determine

if counsel provided effective assistance: (1) whether counsel performed deficiently, and (2) whether the deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. at 687. If a defendant fails to establish one prong of the test, this court need not address the remaining prong. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996). We address only the prejudice prong.

Based on the entirety of the trial record, Joseph Edwards cannot meet his burden to show the testimony from Alexander Salzman surrounding Kelsie Lee's earlier court appearance prejudiced him. Edwards never contended that the burglaries did not occur or that Kelsie Lee did not participate in the crimes. Edwards' sole defense was mistaken identity. He argued that he did not partake in any of the crimes as the masked man. Lee's acceptance of responsibility for the burglaries bears no significance on Edwards' defense of identity. Nor does it identify Edwards as one of the perpetrators.

Kelsie Lee's apology to Alexander and Heather Salzman also bears little significance in the context of the entire trial for the same reason. Joseph Edwards emphasizes that the State alleged Lee and Edwards acted in concert to commit the burglaries. Edwards claims that Lee's apology to the Salzmans meant she accepted responsibility for the burglaries and this apology meant that Edwards, as Lee's partner and co-conspirator, must also be guilty of the burglaries. But Lee never testified that Edwards and she acted in concert. Again, Edwards defended on a mistaken identity. He did not argue that Lee did not participate in the burglaries.

Joseph Edwards also highlights the trial court's instruction to the jury about carefully examining the testimony of an accomplice and to accept the evidence with great caution. If anything, this instruction helped, not harmed, Edwards because the jury would question the veracity of Kelsie Lee's plea and apology. Anyway, the instruction applied to the testimony of Mescha Johnson, who testified at trial, not Lee. Lee did not testify during trial.

## Juror Bias

Joseph Edwards assigns error to the trial court's refusal to dismiss juror 10. Edwards claims the juror held actual or implied bias because of personal knowledge of the crime, and thus the trial court's refusal infringed his constitutional right to an impartial jury. He claims the juror's memory implicates actual bias and therefore this structural error requires reversal of Edwards' conviction.

Both our state and federal constitution guarantee the right to a trial by an impartial jury, which requires an unbiased and unprejudiced jury, free of disqualifying jury misconduct. *State v. Boiko*, 138 Wn. App. 256, 260, 156 P.3d 934 (2007); U.S. CONST. amend. VI; CONST. art. I, § 21. Trial judges carry an obligation to ensure those rights by dismissing unfit jurors during trial. *State v. Berniard*, 182 Wn. App. 106, 117, 327 P.3d 1290 (2014). Knowledge on the part of a juror of incidental or collateral facts, or facts about which there is no controversy, will not render him incompetent to sit in the trial of a case, so long as the juror can lay aside the juror's impression or opinion and render a

23

verdict based on the evidence presented in court. *State v. Winborne*, 4 Wn. App. 2d 147,

165, 420 P.3d 707 (2018); 47 AM. JUR. 2D *Jury* § 239 (2017).

An appellate court reviews a trial court's decision to remove or retain a juror for

abuse of discretion. *State v. Jorden*, 103 Wn. App. 221, 226, 11 P.3d 866 (2000). We

hold that Joseph Edwards' trial judge did not abuse his discretion when denying

Edwards' motion to excuse juror 10.

Joseph Edwards relies primarily on this court's recent decision in *State v.*

*Winborne*, 4 Wn. App. 2d 147 (2018) in support of his argument. In *Winborne*, a juror,

during jury deliberations, recalled that he witnessed some of the events forming the

charges against the defendant who had been charged with several crimes, including two

counts of attempting to elude a police vehicle. The trial court received a note from the

jury which read:

> A juror now realizes he was witness to some of the events of August
> 5th. Does this disqualify him?

*State v. Winborne*, 4 Wn. App. 2d at 155. August 5, the date noted in the juror question,

was the day of the first pursuit, in which the defendant fled police. As a result of this

juror question, Tishawn Winborne moved for the juror to be excused and an alternate

seated. In the alternative, he asked the court to remind the jury that it must base its

decision only on evidence heard during trial. The State proposed that the trial court

question the juror about what he witnessed. The trial court denied Winborne's motion to

dismiss and the State's request to question the juror and instead instructed the juror to review each of the jury instructions provided by the court.

The *Winborne* court held the juror to be disqualified because of bias resulting from his witnessing some of the litigated events. Critical to the court's decision was the fact that the trial court did not question the juror about whether his recall of events might impact his jury service. The court stated:

> Because no one questioned juror W whether his recall, during the course of the trial, of events on August 5 might impact his verdict, the trial court never resolved whether the juror could disregard any opinion based on his remembrance of his observations. Therefore, under Washington's statutory scheme, juror W's observation of a portion of the alleged crime implicates actual, not implied, bias.

*State v. Winborne*, 4 Wn. App. 2d at 159. The court further noted that the juror therefore had knowledge relating to disputed facts, i.e. whether Winborne drove "recklessly."

Joseph Edwards' trial contains many important distinctions from the events surrounding the juror in *State v. Winborne*. In *Winborne*, the juror actually witnessed the events and noted the exact August 5 date to the trial court. The juror indisputably "held percipient knowledge of the events." *State v. Winborne*, 4 Wn. App. 2d at 168. Tishawn Winborne and the State disputed the facts of the occurrence, about which the juror held knowledge and those facts were critical to the guilt or innocence of Winborne.

Joseph Edwards' juror 10 could not aver whether he witnessed events or merely dreamed about the events. Assuming the juror saw events in real life, the juror did not

witness the crimes, but only a tangential event.  Edwards did not dispute having ridden a bike in Kelso shortly after the burglaries.

Due process requires the trial judge, if he or she becomes aware of a possible source of bias, to determine the circumstances, the impact thereof on the juror, and whether or not the accused suffers prejudice.  *Remmer v. United States*, 347 U.S. 227, 230, 74 S. Ct. 450, 98 L. Ed. 654 (1954); *State v. Winborne*, 4 Wn. App. 2d at 160-61.  In *State v. Winborne*, the trial court did not question the juror at all.  Joseph Edwards' trial judge thoroughly questioned juror 10.

On questioning by Joseph Edwards' trial court, juror 10 responded that he could not be certain as to the actuality of the events regarding the bike rider.  The trial court asked if the juror could ignore this memory or dream sequence and focus on the facts presented during trial.  The juror responded that he could.  The juror added: "I believe I could because of the nature of the memory or the dream.  Because it's so faded I don't believe it will affect."  RP at 420.  Defense counsel asked the juror whether the dream or actual event might influence the juror's verdict, to which juror 10 responded in the negative.

Joseph Edwards' trial court instructed juror 10 not to share the event with other jurors.  In *State v. Winborne*, the trial court never instructed the juror not to speak with other jurors about his observations of events relevant to the crime charged.

Uncharged Alternative Means

Joseph Edwards also assigns error to the trial court instructing the jury on an uncharged alternative means of committing robbery in the first degree. The State charged Edwards in counts one and two with robbery in the first degree based solely on his being armed with a deadly weapon. Nevertheless, the to-convict instructions for both charges, jury instructions 22 and 23, included language that the jury could convict Edwards if "the defendant displayed what appeared to be a firearm or other deadly weapon." CP at 38-41. Edwards seeks reversal of his two robbery convictions because the jury may have convicted him based on an uncharged alternative means.

We do not decide whether the jury instructions allowed a conviction based on an uncharged alternative means. Even assuming error, the error was harmless beyond a reasonable doubt.

An erroneous instruction given on behalf of the party in whose favor the verdict was returned is presumed prejudicial unless it affirmatively appears that the error was harmless. *State v. Bray*, 52 Wn. App. 30, 34-35, 756 P.2d 1332 (1988). Because we presume prejudice, the State carries the burden on direct appeal to prove the error harmless. *In re Personal Restraint of Brockie*, 178 Wn.2d 532, 536, 309 P.3d 498 (2013). Such an error may be harmless "if other instructions clearly limit the crime to the charged alternative." *State v. Brewczynski*, 173 Wn. App. 541, 549, 294 P.3d 825 (2013). The error may be harmless if other instructions clearly and specifically define the charged

crime.  *State v. Chino*, 117 Wn. App. 531, 540, 72 P.3d 256 (2003).  The error is harmful when the jury possibly convicted the accused on the basis of the uncharged alternative. *State v. Chino*, 117 Wn. App. at 540-41.

Joseph Edwards contends that his appeal echoes the facts in *State v. Brewczynski*, 173 Wn. App. 541 (2013), while the State argues this appeal parallels the facts in *State v. Nicholas*, 55 Wn. App. 261, 776 P.2d 1385 (1989).  Therefore, we dissect both decisions.

In *State v. Brewczynski*, the State of Washington charged David Brewczynski by amended information with premeditated first degree murder with aggravating circumstances, first degree burglary, and theft of a firearm.  The jury convicted him as charged and found by special verdict that he was armed with a firearm.  The first degree burglary charge alleged Brewczynski entered and remained unlawfully in the victim's building and, while in the building and in immediate flight from the building, was armed with a handgun.  The court gave a jury instruction stating that "[a] person commits the crime of burglary in the first degree when he or she enters or remains unlawfully in a building with intent to commit a crime against a person or property therein, and if, in entering or while in the building or in immediate flight therefrom, that person is armed with a deadly weapon *or* assaults any person."  *State v. Brewczynski*, 173 Wn. App. at 549.  The trial court also gave the "to convict" instruction that required the jury to find beyond a reasonable doubt that Brewczynski either was armed with a deadly weapon or assaulted a person.

The *Brewczynski* court first ruled that the trial court committed error by instructing the jury on the uncharged alternative of assault of a person. The court next held that, because none of the remaining instructions limited the jury to consider only the "armed with a deadly weapon" alternative of first degree burglary and the prosecutor in closing urged the jury to consider both alternatives, the error was not harmless. Under those conditions, the jury may have convicted the defendant on the basis of the uncharged alternative.

In *State v. Nicholas*, 55 Wn. App. 261 (1989), the State of Washington charged Duane Nicholas with four counts of first degree robbery while armed with a deadly weapon. The information did not plead that Nicholas displayed what appeared to be a deadly weapon. On count one, the trial court instructed the jury that it could convict Nicholas if it found that he was either armed with a deadly weapon or displayed what appeared to be a firearm or deadly weapon. Nicholas argued that his first degree robbery conviction required reversal because the jury was instructed on an alternative means never charged. This court held that the instruction erroneously submitted to the jury was the uncharged alternative means of committing first degree robbery set forth in RCW 9A.56.200(1)(b). This court concluded, however, that, even assuming the error to be of constitutional magnitude, the error was harmless beyond a reasonable doubt. The court observed that the jury found by special verdict that Nicholas was armed with a deadly weapon at the time of the commission of the crime. Because the trial court

instructed the jury that the State had to prove this fact beyond a reasonable doubt, no possibility existed that the jury impermissibly convicted Nicholas on the uncharged alternative.

The facts of Joseph Edwards' appeal echo the facts in *State v. Nicholas*. The State charged Joseph Edwards, like it did Duane Nicholas, with robbery in the first degree with the information solely alleging the defendant being armed with a deadly weapon. Similar to *Nicholas*, the trial court instructed the jury on both the defendant being armed with a deadly weapon and the defendant displaying what appeared to be a firearm or other deadly weapon. Nevertheless, Joseph Edwards' jury, as did Nicholas' jury, returned a special verdict form concluding Edwards was armed with a deadly weapon, at the time of the commission of the crime. As in *Nicholas*, the trial court instructed the jury that the State must prove beyond a reasonable doubt that Edwards was armed with a deadly weapon at the time of the commission of the crime of robbery in the first degree as charged in counts I and II.

Other instructions in Joseph Edwards' prosecution effectively defined the charged crime. For example, jury instruction 29 stated: "[a] person is armed with a deadly weapon if, at the time of the commission of the crime, the weapon is easily accessible and readily available for offensive or defensive use." CP at 49. The same instruction defined a deadly weapon as "an implement or instrument that has the capacity to inflict death and,

from the manner in which it is used, is likely to produce or may easily produce death."
CP at 49.

Joseph Edwards correctly emphasizes that his prosecutor in closing argument mentioned his being armed with a deadly weapon and displaying a deadly weapon. The *Brewczynski* court considered this argument significant in its harmless error analysis. Nevertheless, Edwards incorrectly argues that none of the court's remaining instructions limited the jury to considering only his being armed. As discussed above, other instructions limited the crime to Edwards being armed with a deadly weapon.

Burglary Convictions

The jury convicted Joseph Edwards of first degree burglary of the Collazo home because he assaulted Alexander Collazo. The jury also convicted Edwards on a separate count of first degree burglary of the Collazo home because he assaulted Jessica Collazo. Edwards successfully moved the trial court to vacate one of the convictions on double jeopardy grounds because of the similarity of the two convictions. Nevertheless, Edwards assigns error on appeal that his judgment and sentence still reflects the entry of a conviction for count 4 and count 5, the burglary convictions stemming from the Collazo crimes. Edwards asks that this court remand for the trial court to vacate one of the Collazo burglary convictions and strike all reference to it in the judgment and sentence. The State concedes error and agrees that either count 4 or count 5 must be vacated. We agree.

The Fifth Amendment to the United States Constitution and article I, section 9 of the Washington State Constitution provide protections against double jeopardy. *State v. Brown*, 159 Wn. App. 1, 9, 248 P.3d 518 (2010). Double jeopardy prohibits the State from punishing an offender multiple times for the same offense. *State v. Linton*, 156 Wn.2d 777, 783, 132 P.3d 127 (2006). While the State may bring multiple charges arising from the same criminal conduct, the double jeopardy prohibition forbids a trial court from entering multiple convictions for the same offense. *State v. Freeman*, 153 Wn.2d 765, 770, 108 P.3d 753 (2005). When two convictions violate double jeopardy, the proper remedy is to vacate the lesser of the two offenses. *State v. Turner*, 169 Wn.2d 448, 465-66, 238 P.3d 461 (2010).

Joseph Edwards' judgment and sentence reflects two burglary convictions that arise from the Collazo crimes. A conviction in itself, even without imposition of sentence, carries an unmistakable onus with a punitive effect. *State v. Calle*, 125 Wn.2d 769, 774, 888 P.2d 155 (1995). To assure the observation of double jeopardy proscriptions, a judgment and sentence must not include any reference to the vacated conviction. We remand for the trial court to vacate the conviction of Joseph Edwards on either count 4 or 5 and strike all reference to the one conviction in the judgment and sentence.

Joseph Edwards also contends that, since his burglary in the first degree conviction for entering the Salzman residence merged into the two counts of first degree

32

robbery, the trial court erred by including the conviction for count 3 in his judgment and sentence. Edwards also argues that the court failed to remove the corresponding two-year deadly weapon enhancement from the standard range sentence for each remaining offense. The State responds that, if this court affirms Edwards' convictions on counts 1 and 2 for robbery in the first degree, we should vacate count 3 and strike the corresponding 24-month deadly weapon enhancement.

*State v. Parmelee*, 108 Wn. App. 702, 711, 32 P.3d 1029 (2001) suggests that the remedy, when two offenses merge, is to vacate the lesser offense. Based on the State's concession, we direct that the trial court vacate the conviction on count 3. If an offense is vacated and the defendant is not sentenced for it, RCW 9.94A.533 does not allow imposing a term for the corresponding firearm enhancement. *State v. Davis*, 177 Wn. App. 454, 465 n.10, 311 P.3d 1278 (2013). Thus, the trial court should also vacate count 3's corresponding firearm enhancement.

Legal Financial Obligations

Joseph Edwards asks this court, pursuant to *State v. Ramirez*, 191 Wn.2d 732, 426 P.3d 714 (2018), to remand for the trial court to strike a $200 criminal filing fee, $250 jury demand fee, and $100 DNA fee because of his indigency. The State agrees. Based on the State's concession, we direct the trial court to strike the fees.

Edwards also argues that, because extradition expenses are discretionary, this court should reverse the imposition of $5,862.22 in extradition expenses. No court has

yet to address the imposition of extradition costs on an indigent offender. Nevertheless,

RCW 10.01.160(2) authorizes the imposition of extradition expenses on a conviction.

*State v. Cawyer*, 182 Wn. App. 610, 623, 330 P.3d 219 (2014). But, these extradition

costs are not mandatory. RCW 10.01.160 reads, in pertinent part, "[e]xcept as provided

in subsection (3) of this section, the court *may* require a defendant to pay costs."

(Emphasis added.) Thus, extradition costs are discretionary.

Under *State v. Ramirez*, 191 Wn.2d 732 (2018), the trial court lacked statutory

authority to impose discretionary extradition costs on Joseph Edwards, as Edwards was

indigent at the time of sentencing. Therefore, we also remand for the striking of the

$5,862.22 in extradition expenses.

## Statement of Additional Grounds (SAG)

Pursuant to RAP 10.10, Joseph Edwards raises a number of issues in a statement

of additional grounds.

### *Alternative means*

Joseph Edwards first contends that his two first degree robbery convictions must

be reversed because the trial court did not instruct the jury that it must unanimously agree

on the charged alternative means. We do not consider arguments repetitive of appellant

counsel's briefing. *State v. Calvin*, 176 Wn. App. 1, 26, 316 P.3d 496 (2013).

*Ineffective Assistance of Counsel*

Joseph Edwards next contends that his attorney performed ineffectively when failing to ask for the exclusion of certain evidence, when failing to bring a motion to suppress letters found in his jail cell, and when failing to research the law to support exclusion and suppression of evidence. Nevertheless, he fails to identify any inadmissible evidence. Edwards also does not explain how the failure to make such motions prejudiced him. The defendant bears the burden of showing that the result would have been different but for counsel's deficient representation. *State v. McFarland*, 127 Wn.2d 322, 337, 899 P.2d 1251 (1995). Edwards makes no such showing.

Joseph Edwards criticizes his counsel for failing to bring a motion to suppress letters that jail staff found in his cell. He implicitly argues that jail staff violated his Fourth Amendment right when seizing the letters.

To demonstrate ineffective assistance of counsel, a defendant must show: (1) defense counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness based on consideration of all the circumstances and (2) defense counsel's deficient representation prejudiced the defendant. *State v. McFarland*, 127 Wn.2d at 334-35. When a defendant's claim of ineffective assistance is based on counsel's failure to challenge the admission of evidence, a defendant must show "(1) an absence of

legitimate strategic or tactical reasons supporting the challenged conduct . . .; (2) that an objection to the evidence would likely have been sustained . . .; and (3) that the result of the trial would have been different had the evidence not been admitted. . . ." *State v. Saunders*, 91 Wn. App. 575, 578, 958 P.2d 364 (1998).

Joseph Edwards fails to meet any of the three criteria when contending his trial counsel performed deficiently when failing to litigate a motion to suppress. Edwards cites case law pertaining to illegal searches and seizures, as well as *State v. Reichenbach*, 153 Wn.2d 126, 101 P.3d 80 (2004), with an explanatory parenthetical stating "[f]ailure to challenge admissibility of evidence with suppression was ineffective assistance of counsel." SAG at 8-9. Nevertheless, Edwards does not argue an absence of a legitimate tactical reason to withhold the motion. Edwards also fails to show that a motion to suppress would have been granted or that the results of the trial would have been different.

*Prosecutorial Misconduct*

Joseph Edwards contends the prosecutor uttered improper and prejudicial comments during closing argument as well as expressing a personal belief on evidence and personal opinion on Edwards' guilt. Edwards identifies the following passage in the State's rebuttal argument:

>    They drove there in the car.  The car contained the gloves.  The
> gloves had the DNA that belonged to the defendant, gloves used in the first
> instant of the Salzmans.

RP at 521.  Edwards argues that no one testified to these purported facts.  The State

responds that evidence supported the argument.

To prevail on a claim of prosecutorial misconduct, Joseph Edwards must show

that the prosecutor's statements were both improper and prejudicial.  *State v. Emery*, 174

Wn.2d 741, 756, 278 P.3d 653 (2012).  In the context of closing arguments, misconduct

includes uttering remarks unsupported by the evidence.  *In re Personal Restraint of*

*Yates*, 177 Wn.2d 1, 58, 296 P.3d 872 (2013).  The prosecutor has wide latitude in

making arguments to the jury and the prosecutor can draw reasonable inferences from the

evidence.  *In re Personal Restraint of Yates*, 177 Wn.2d at 58-60.

If a defendant establishes that the State attorney's statements were improper,

prejudice is determined under one of two standards of review.  When, as here, the

defendant did not object at trial, the defendant is deemed to have waived any error, unless

the prosecutor's misconduct was so flagrant and ill-intentioned that an instruction could

not have cured the resulting prejudice.  *State v. Emery*, 174 Wn.2d at 760-61.  In

analyzing prejudice, we do not look at the comments in isolation, but in the context of the

total argument, the issues in the case, the evidence, and the instructions given to the jury.

*State v. Warren*, 165 Wn.2d 17, 28, 195 P.3d 940 (2008).

Evidence supported the identified statements of Joseph Edwards' prosecutor. Kelso Police Officer Craig Christianson testified that he found vinyl-type gloves in Mescha Johnson's car. Officer Christianson then sent the gloves to the Washington State Patrol Crime Lab. Brad Dixon analyzed the glove found on the back seat of Johnson's car. Dixon found a major profile based on samples taken from the interior and exterior of the glove and determined the DNA profiles from the major profile matched the profile of Edwards. Mescha Johnson testified that she, Kelsie Lee, Edwards, and a fourth anonymous man took Johnson's car to the Salzman's home and burglarized the couple. When drawing reasonable inferences from the evidence, one may conclude that the glove found in Johnson's car, with Edwards' DNA thereon, could have been used in the Salzman home invasion by Edwards. The statement also did not reference a personal belief of the prosecutor. Because the prosecution uttered no misstatement, we do not address potential prejudice.

## CONCLUSION

We affirm Joseph Edwards' convictions, except that we remand for the trial court to vacate either count 4 or 5 and to strike all reference to the vacated conviction in the judgment and sentence. We also remand for the trial court to vacate count 3, the Salzman burglary conviction, and the corresponding deadly weapon enhancement and to strike all

No. 51174-6-II
*State v. Edwards*

references to the conviction and enhancement. Finally, we remand to strike the offending

legal financial obligations.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Fearing, J. [1]

WE CONCUR:

_____
Melnick, J.

_____
Glasgow, J.

_____

[1] Judge George Fearing is a Division III judge serving with the Court of Appeals,
Division II, under CAR 21(a).