IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

STATE OF WASHINGTON,           )
                               )     No.  38003-3-III
                Respondent,    )
                               )
        v.                     )     UNPUBLISHED OPINION
                               )
PHILIP NOLAN LESTER,           )
                               )
                Appellant.     )

FEARING, J. — Philip Lester assigns various errors to the trial court proceeding,

during which a jury convicted him of one count of rape of a child in the first degree and

one count of child molestation in the first degree.  He also assigns error to his sentence.

We affirm Lester's convictions and sentence, but remand for the striking of two

community custody conditions.

FACTS

The State alleged that Philip Lester raped and molested a four-year-old neighbor,

who we pseudonymously name Jane.  We gather the important facts from trial testimony.

On December 31, 2014, Jane played with playdoh when she told her mother,

Miranda Bishop, that the playdoh looked like "Uncle Junior's pee pee."  Report of

Proceedings (RP) at 220.  "Uncle Junior" was Jane's name for Philip Lester, whose

girlfriend, Ashley Lamont, babysat Jane. Jane's comment prompted Bishop to contact law enforcement.

On January 2, 2015, Okanogan County Sheriff Detective Deborah Behymer recorded an interview of Jane. Jane remarked that Lester put his penis in her mouth and rubbed it on her. Lester licked her butt with his tongue and put his butt onto Jane's face. Lester touched her belly, breasts, feet, hands, knees, and arms. Jane disclosed that these incidents occurred after Christmas and had happened more than one time.

On January 6, 2015, Jane visited Family Health Centers, where health care assistant Karen Cagle and Dr. James Weber examined her. Exhibit 7 at trial was the notes of the visit. Under the "Assessment/Plan" section, exhibit 7 read:

| # | Detail Type | Description |
|---|---|---|
| 1. | Assessment | Suspected child sexual abuse (V71.81). |
| | Impression | History is quite convincing –exam normal but that does not rule out any abuse it merely indicates that there is no visible trauma at this time. There may not have been significant penetration, but this cannot be ruled out also. |
| | Patient Plan | Will work with law enforcement as well as CPS as required and needed |

Exhibit (Ex.) 7 at 1 (spelling and grammar corrected). Under "History of Present Illness," the medical notes declared:

> 1. Sore bottom
> The symptoms began 6 days ago and generally lasts 1 Week. The symptoms occur randomly. On New Year's Eve she was playing with playdoh—and showed her mother a phallic shaped structure and told mom "This is what Uncle hurts my bottom with." Evidently she went on to tell her mom that he put it in her mouth and peed on her bottom with it. Her

2

uncle and his girlfriend have been babysitting her while mom has been working since the beginning of October. No blood noticed in panties, clothes, or visualized stool. No complaints of dysuria. [Jane] has already been interviewed by the police and the CPS worker.

Ex. 7 at 1 (spelling and grammar corrected). The notes ended with: "Document generated by: Karen L. Cagle HCA/ACE 01/08/2015 03:07 PM." Ex. 7 at 3.

On January 7, 2015, Detective Deborah Behymer recorded an interview of Philip Lester. During portions of the interview, Detective Behymer mentioned the credibility of the accusations against Lester:

> DETECTIVE: Okay. Okay. Well, what you need to understand is when [Jane] was interviewed and I—you know that I've done this now for a long time.
> MR. LESTER: Yeah.
> DETECTIVE: And in this interview, she knows things that she shouldn't know. Okay? So, you know, I don't—I'm not here to—I'm not judging you. I'm not here to—but [Jane] is extremely credible in what she had to say, even though she's only four. Okay? It was digitally recorded and audio recorded and it was an extremely good disclosure on her part of some of the things that happened with you at your house.
> MR. LESTER: Huh.
> DETECTIVE: And there's—I got no—no—everything she told me I felt was very credible. It was very true. I mean it was—there's absolutely no reason for her to be lying. And actually, I didn't even have to ask too many questions. She was ready to talk.

RP at 365-66.

Later in the interview, Detective Deborah Behymer broached Jane's capacity to lie about the allegations:

> DETECTIVE: There's absolutely no reason somebody would make this up against you just to pick on you. This isn't something people do.

Not—not this. And that little girl is not able to hold a lie continuously
when you ask questions. That little girl would not be able to lie about what
she said. Okay? She's not capable of doing that. We would have tripped
her up. So, something happened at your house with [Jane].

RP at 367.

DETECTIVE: Okay. So, how do you think she'd come up with this
statement—why would she, why do you think [Jane] would do this?
MR. LESTER: She's been told because her mom's been telling her
to do this and do this and she—she, you know, [Jane] don't hardly listen
half the time anyways.
DETECTIVE: Right, so—
MR. LESTER: When her mom corrects her.
DETECTIVE: —why would she be able to keep a lie like that? She
wouldn't. She's four. She wouldn't be able to keep a lie.

RP at 369.

PROCEDURE

Philip Lester's first trial resulted in convictions for first degree child rape and first

degree child molestation. This court reversed the convictions and remanded for a new

trial due to the erroneous admission of a forensic interview with Jane despite Jane not

testifying at the trial. *State v. Lester*, No. 34806-7-III, slip op. (Wash. Ct. App. June 19,

2018) (unpublished), https://www.courts.wa.gov/opinions/pdf/348067_unp.pdf.

The second trial began with testimony from Miranda Bishop, Jane's mother.

Bishop averred that she left Jane with Ashley Lamont for babysitting while Bishop

worked. When Bishop returned to retrieve Jane, Philip Lester would sometimes be

present. Bishop testified that Jane began to report pain in her butt and she began

4

returning from Lamont's home without underwear. Bishop concluded that insufficient

wiping caused the pain in the buttocks.

> Q But you noticed that she started coming home without her
> underwear?
> A Yes.
> Q And do you recall approximately how many times this happened?
> A Maybe 5 or 6.
> Q And this would have been from when to when?
> A October/November.
> Q . . . So, what's going through your mind? Your daughter is
> starting to come home missing underwear. What—what's going through
> your mind?
> A I didn't know what to think.
> Q I mean were—were you concerned about it?
> A At the time, no. I thought it was just her, you know, because of
> everything else that was happening. But then it started to worry me so she
> wasn't going there as much.
> Q And I'm sorry, I'm not following you.
> A I had two other people that were babysitting. So, she started going
> to the other babysitters more after November.

RP at 229-30.

Miranda Bishop testified that Lamont continued to babysit Jane in December

2014:

> Q So, I want to focus your attention to the time period December 1,
> 2014 to January 1, 2015. How many times was your daughter babysat at
> [Philip] Lester's residence or trailer? In December, how many times was
> your daughter babysat by Ashley [Lamont]?
> A From December 1st and up until probably December, what was it,
> 24th, 2 to 3 times a week, if not a little more.

RP at 245. Bishop later declared that Jane probably spent less time at Lamont's abode in

December and Lamont last babysat Jane on December 24.

Jane testified during trial. She recalled telling her mother that Philip Lester had put his penis into her mouth. Jane averred that, while sleeping on the couch during babysitting, Lester licked her vagina. The State played the video recording of Detective Deborah Behymer's January 2 interview with Jane.

Philip Lester objected to introduction of his January 7 recorded interview conducted by Detective Deborah Behymer. He complained about Behymer's statements concerning Jane's credibility during the interview. The State responded that Behymer would testify that law enforcement often lies to interrogation suspects. Lester then abandoned the objection as to the statements by Behymer about Jane's credibility. Behymer testified that she does not always tell interrogation subjects the truth, because she gains an advantage by telling a suspect that clear evidence already supports the criminal allegations. The State played portions of the recorded interview for the jury, including Behymer's comments on Jane's credibility.

Philip Lester objected to the introduction of exhibit 7, the medical notes from Jane's January 6 visit to Family Health Centers. Lester complained about the report's entry: "History is quite convincing." RP at 383. The report's content failed to identify the nature or extent of this purported "history." Lester also noted that the State intended to introduce the medical report through health care assistant, Karen Cagle, not the physician, James Weber. According to Lester, Cagle was merely the custodian of the

record and admission should be denied because Cagle could not verify the accuracy of the statement within.

In response to Philip Lester's objection, the State commented that it did not seek introduction of exhibit 7 under the business records exception to the hearsay rule. The State sought admission under the medical records exception found in ER 803(a)(4). The State claimed Dr. James Weber was no longer available, because he had moved and may be dead.

In reply, Philip Lester cited *State v. Redmond*, 150 Wn.2d 489, 78 P.3d 1001 (2003), a Washington decision, which held that the trial court must redact a portion of the medical record that assigned fault for an assault. After the trial court distinguished the *Redmond* decision, the court ruled the exhibit admissible as a medical record exception. Lester's counsel then exclaimed that he could not "cross[-]examine the author of this impression." RP at 386. The trial court held to its decision and added the business record exception as a ground for admission.

Karen Cagle, certified medical assistant at Mid Valley Orthopedics, testified to Jane's January 6 visit. Cagle testified that she had "generated" the medical report listed as exhibit 7. RP at 396. The State questioned Cagle as to who had prepared the medical report:

> Q And you prepared this?
> A A portion of it, yes.
> Q Well, I'm sorry. Maybe I misunderstood then. Who—who

7

prepared the rest of it?

> A It's both Dr. [James] Weber and I. It's mainly his notes that he— that he documents his movement, his comments, his observation.
>
> Q And does he do that contemporaneously while he's examining the patient?
>
> A Correct. He writes—he generally writes his notes on—on paper and then he comes out to his—his office and dictates.

RP at 401.

Karen Cagle read the contents of exhibit 7's "Assessment/Plan" and "History of Present Illness" sections to the jury. On cross-examination, Cagle admitted her absence from the examination room while Dr. James Weber conducted the exam. Cagle testified that she was only responsible for checking and recording Jane's vital signs. Defense counsel questioned Cagle:

> Q Did you have any role in obtaining the history prior to the exam?
>
> A I'm trying to remember. Generally, I—generally, I do, if we have the time to do that. When it's an urgent visit sometimes we don't have the time to do a background.

RP at 402.

Jury instruction 4 read:

> A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count.

Clerk's Papers (CP) at 86. Jury instructions 8 and 10 required the jury to find that the alleged criminal acts had occurred "on or between December 1, 2014 and January 1, 2015." CP at 90, 92.

In closing argument, the prosecuting attorney commented:

>  Jury Instruction Number 10.  Sexual contact.  And that's defined for you.  So and [sic] I hate to put this bluntly.  Rubbing her breasts, that's sexual contact.  Just as intercourse can be vaginal, anal, can be the mouth.

RP at 487.  The jury returned guilty verdicts on both charges.

During sentencing, the trial court commented:

>  I do weigh heavily the fact that this young lady, who was 10 at the time of the trial, faced cross examination, faced reliving and having to explain what occurred and to deal with that, has exacerbated and actually escalated psychological emotional [sic] and the Court is taking that into consideration.

RP at 553.

The trial court imposed a sentence below the statutory maximum for each

conviction.  The trial court imposed as conditions of community custody:

>  (20) That you do not access the Internet without an [sic] safety plan that has been approved in advance by your sex offender therapist and your community corrections officer;
>  . . . .
>  (23) That you do not possess photographic equipment without prior approval from your sex offender therapsit [sic] and your community corrections officer.

CP at 153.

## LAW AND ANALYSIS

On appeal, Philip Lester assigns numerous errors leading to his convictions.  He

contends the trial court erroneously admitted exhibit 7, his attorney performed

ineffectively when failing to object to introduction of his recorded statement wherein

9

Detective Deborah Behymer spoke about Jane's credibility, he suffered double jeopardy by the two convictions, his attorney performed deficiently when failing to ask for a separate and distinct acts jury instruction or a jury unanimity instruction, and insufficient evidence supported a finding that he committed the alleged acts during the charging period. He also challenges his sentence and two community custody conditions.

Philip Lester objects to language in exhibit 7 that read: "history is quite convincing" and "will work with law enforcement as well as CPS as required and needed." Ex. 7 at 1. Lester maintains that the first phrase contained testimonial statements of Dr. Weber, who was not subjected to cross-examination. Therefore, admission of the exhibit violated his rights under the confrontation clause. He also argues that this same phrase constituted an impermissible opinion as to the credibility of the alleged victim. We first address the confrontation clause and then vouching.

Confrontation Clause

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The testimonial statements of a witness who does not appear at trial are inadmissible unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 54-55, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

Only testimonial out-of-court statements fall within the scope of the confrontation clause. *Davis v. Washington*, 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d 224

10

(2006). Statements become testimonial if made for the primary purpose of establishing or proving past events potentially relevant to later criminal prosecution. *Davis v. Washington*, 547 U.S. 813, 822 (2006). Washington courts apply the primary purpose test to determine whether any out-of-court statements are testimonial, regardless of to whom they are made. *State v. Burke*, 196 Wn.2d 712, 725-26, 478 P.3d 1096 (2021), *cert. denied*, 142 S. Ct. 182, 211 L. Ed. 2d 74 (2021).

We do not address whether the challenged medical notes qualify as testimonial in nature because Philip Lester did not object, before the trial court, to the exhibit's admission on the basis of the confrontation clause. Trial counsel instead asserted the hearsay rule and argued that no exception applied to the hearsay rule. He cited *State v. Redmond*, 150 Wn.2d 489 (2003), which only concerns a violation of the hearsay rule.

RAP 2.5(a) formalizes a fundamental principle of appellate review. The first sentence of the rule reads:

> Errors Raised for First Time on Review. The appellate court may refuse to review any claim of error which was not raised in the trial court.

(Boldface omitted.) No procedural principle is more familiar than that a constitutional right, or a right of any other sort, may be forfeited in criminal cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it. *United States v. Olano*, 507 U.S. 725, 731, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993); *Yakus v. United States*, 321 U.S. 414, 444, 64 S. Ct. 660, 88 L. Ed. 834 (1944).

11

Good sense lies behind the requirement that arguments be first asserted at trial. The prerequisite affords the trial court an opportunity to rule correctly on a matter before it can be presented on appeal. *State v. Strine*, 176 Wn.2d 742, 749, 293 P.3d 1177 (2013). The rule serves the goal of judicial economy by enabling trial courts to correct mistakes and thereby obviate the needless expense of appellate review and further trials, facilitates appellate review by ensuring that a complete record of the issues will be available, and prevents adversarial unfairness by ensuring that the prevailing party is not deprived of victory by claimed errors that he had no opportunity to address. *State v. Strine*, 176 Wn.2d 742, 749-50 (2013); *State v. Scott*, 110 Wn.2d 682, 685-86, 757 P.2d 492 (1988).

ER 103(a)(1) requires an objection to admission of evidence to state "the specific ground of objection, if the specific ground was not apparent from the context." The appellant may not assign error to an evidentiary ruling when the objection at trial failed to apprise the trial judge of the grounds of objection asserted on appeal. *State v. Maule*, 35 Wn. App. 287, 291, 667 P.2d 96 (1983).

An appellant may raise some constitutional errors for the first time on appeal if the appellant shows a manifest constitutional error. RAP 2.5(a)(3). This exception does not apply, however, to confrontation clause assignments. *State v. Berniard*, 182 Wn. App. 106, 124, 327 P.3d 1290 (2014). The defendant must timely raise the issue in the trial court or waive the right to confrontation. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305,

327, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009); *State v. Burns*, 193 Wn.2d 190, 210-11, 438 P.3d 1183 (2019). The defendant always has the burden of raising his confrontation clause objection before the trial court. *State v. Berniard*, 182 Wn. App. 106, 124 (2014).

In *State v. Burns*, 193 Wn.2d 190 (2019), the Washington Supreme Court adopted the purposes behind the confrontation clause rule as expressed by this court in *State v. O'Cain*, 169 Wn. App. 228, 279 P.3d 926 (2012). Allowing a defendant to assert a confrontation claim for the first time on appeal places the trial judge in a compromising position. The judge would be faced with the decision to sua sponte identify and rule on a confrontation clause violation, which may disrupt trial or defense tactics or risk presiding over a trial that could be reversed on appeal. Whether defense counsel will object on confrontation grounds can unquestionably be a trial tactic. Requiring an objection also has a practicable aspect: the trial court judge will rule on the objection, giving the appellate courts an actual trial court decision to review.

Philip Lester objected to exhibit 7, the medical note, on the ground of hearsay. A hearsay objection does not also constitute a confrontation clause objection. Although a confrontation clause challenge requires the trial court to engage in a hearsay analysis, the former challenge comprises a more lengthy and sophisticated analysis. Even hearsay with an applicable exception becomes inadmissible if its admission violates a defendant's confrontation clause rights precluding testimonial hearsay. *Davis v. Washington*, 547 U.S. 813, 821 (2006). The trial court must also determine whether the hearsay is

13

testimonial hearsay, whether the out of court declarant is unavailable to testify, and whether the defendant had a prior opportunity for cross-examination of the declarant. *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004); *State v. Beadle*, 173 Wn.2d 97, 107, 265 P.3d 863 (2011). The trial court lacked an opportunity to address these elements of a confrontation clause challenge and thus denying review of Philip Lester's assignment of error serves a primary purpose behind RAP 2.5(a).

Vouching

On appeal, Philip Lester alternatively argues that exhibit 7's admission formed error because the exhibit contained impermissible comments regarding Jane's credibility. He highlights the entry: "history is quite convincing." Ex. 7 at 1. We also decline to address this contention for failure to preserve the error before the trial court. Lester did not object to the exhibit, before the superior court, on the basis of impermissible vouching. On appeal, he does not assert manifest constitutional error.

Opinion of Law Enforcement Officer

Philip Lester argues that his trial counsel provided ineffective assistance when abandoning an objection to multiple, repeated opinions by Detective Deborah Behymer during the recorded interview of Lester that Jane posited credible accusations.

To demonstrate ineffective assistance of counsel, a defendant must make two showings: (1) defense counsel's representation fell below an objective standard of reasonableness and (2) defense counsel's deficient representation prejudiced the

14

defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Vazquez*, 198 Wn.2d 239, 247-48, 494 P.3d 424 (2021). Courts indulge a strong presumption that counsel is effective. *State v. Vazquez*, 198 Wn.2d 239, 247 (2021).

Deficient performance occurs when counsel's performance cannot be attributed to any conceivable legitimate tactic. *State v. Carson*, 184 Wn.2d 207, 218, 357 P.3d 1064 (2015). The law imposes a strong presumption that counsel exercised reasonable professional judgment to render adequate assistance. *State v. Carson*, 184 Wn.2d 207, 216 (2015). To rebut this presumption, the defendant carries a burden to establish no legitimate strategic or tactical reasons explaining counsel's performance. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).

A classic example of trial tactics is when and how an attorney makes the decision to object during trial testimony. *State v. Vazquez*, 198 Wn.2d 239, 248 (2021). Defense counsel engages in legitimate trial tactics when forgoing an objection in circumstances when counsel wishes to avoid highlighting certain evidence. *In re Personal Restraint of Davis*, 152 Wn.2d 647, 714, 101 P.3d 1 (2004).

We discern a legitimate trial strategy behind trial defense counsel's withdrawal of an objection to Detective Deborah Behymer's testimony beyond the possibility of not wanting to emphasize some evidence. Counsel could have wanted to emphasize that Behymer conceded she was lying to Philip Lester when she insisted to him that Jane

related a credible story or was a credible witness. This testimony showed that law enforcement officers lack any compunction for telling lies when they wish to accomplish some goal such as convicting an accused.

## Double Jeopardy

Philip Lester argues that the failure to provide a separate and distinct acts jury instruction constituted prejudicial error. The United States Constitution and Washington State Constitution both protect the right of individuals to be free from double jeopardy. U.S. CONST. amend. V; WASH. CONST. art. I, § 9. Double jeopardy may be raised for the first time on appeal. *State v. Mutch*, 171 Wn.2d 646, 661, 254 P.3d 803 (2011). This court reviews the entire record to consider whether insufficient jury instructions actually effected a double jeopardy error and need not find error if it was manifestly apparent to the jury that each count represented a separate act. *State v. Peña Fuentes*, 179 Wn.2d 808, 824, 318 P.3d 257 (2014).

We need not ask whether rape of a child and child molestation can arise from the same act. The State, during closing argument, can inform the jury which separate and distinct acts the prosecution relied on to prove the charges of child rape and child molestation. *State v. Peña Fuentes*, 179 Wn.2d 808, 825-26 (2014). The State, in Philip Lester's prosecution, informed the jury during closing argument that "sexual contact" under the child molestation charge was based on Philip Lester's touching of Jane's

16

breasts. The jury knew that the State based the child rape and child molestation charges on separate and distinct acts.

## Ineffective Assistance for Failure to Propose a Jury Instruction

Philip Lester also contends that his trial counsel performed ineffectively when failing to request a separate and distinct act jury instruction. Such an instruction would require the jury to unanimously agree to one distinct act as constituting each of the separate crimes. For the same reason that we reject Lester's double jeopardy contention, we reject his assignment of ineffective assistance of counsel. The trial court need not deliver a jury unanimity instruction when the State elects what particular act forms the basis for the separate charges and informs the jury of that election during closing. *State v. Carson*, 184 Wn.2d 207, 227 (2015); *State v. Lee*, 12 Wn. App. 2d 378, 393, 460 P.3d 701 (2020), *review denied*, 195 Wn.2d 1032, 468 P.3d 622 (2020).

## Charging Period

Philip Lester next argues that the State failed to demonstrate sufficient evidence that the charged crimes occurred "on or between" December 1, 2014 and January 1, 2015, the date range indicated in the jury instructions for both charges. The State assumes the burden of proving otherwise unnecessary elements made part of a "to convict" instruction. *State v. Hickman*, 135 Wn.2d 97, 102, 954 P.2d 900 (1998).

Accepting, without deciding, that the State was required to prove that the charged acts occurred within the provided date range, sufficient evidence supported Philip

Lester's convictions. When determining whether sufficient evidence proves an added element, this court inquires whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Hickman*, 135 Wn.2d 97, 103 (1998). This court defers to the finder of fact in resolving conflicting evidence and credibility determinations. *State v. Camrillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990), *abrogated on other grounds by State v. Crossguns*, 199 Wn.2d 282, 505 P.3d 529 (2022).

Miranda Bishop testified that Jane had stayed overnight at Ashley Lamont's home in December 2014, although she answered inconsistently as to how many stays occurred. In her interview with Detective Deborah Behymer, Jane said that the abuse occurred after Christmas, although Bishop averred that Jane did not visit Lamont's residence after Christmas Eve. Bishop's testimony also suggested, however, that the criminal acts occurred before December 2014, when Jane began returning home without her underwear. The jury, acting as fact finder, was tasked to resolve the conflicting testimony and determine the credibility of the witnesses. Drawing all inferences in favor of the State, the jury could reasonably have found that the criminal acts occurred at some time between December 1, 2014 and January 1, 2015.

Sentencing Court Remarks

Philip Lester argues that the sentencing court's consideration of the emotional toll experienced by Jane when testifying punished him for exercising his right to trial. The

18

State responds that Lester's ultimate sentence fell within the standard range and is therefore not appealable. We reject the State's request to deny appellate review of this assigned error, but we affirm the sentence nonetheless.

Under the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, a sentence within the standard range shall not be appealed. RCW 9.94A.585(1). But the SRA does not bar this court's review of a sentencing court's constitutional error. *State v. Mail*, 121 Wn.2d 707, 712, 854 P.2d 1042 (1993); *State v. McNeair*, 88 Wn. App. 331, 335-37, 944 P.2d 1099 (1997). The imposition of a penalty for the exercise of a defendant's legal rights violates due process. *State v. Sandefer*, 79 Wn. App. 178, 181, 900 P.2d 1132 (1995).

No constitutional principle precludes the sentencing court from consideration of a crime's impact on a victim. A court may properly consider the details, flavor, and impact on victims of the offense as presented at trial. *United States v. Carter*, 804 F.2d 508, 514 (9th Cir. 1986). The relived trauma of courtroom testimony is an extension of the trauma inflicted by a defendant's crimes against a victim.

In *State v. Sandefer*, 79 Wn. App. 178 (1995), a jury convicted Paul Sandefer on one count of first degree child molestation. The trial court sentenced Sandefer to the top of the standard range. The court informed Sandefer that, if he had entered a guilty plea, he may have received a more lenient sentence as it would have saved the child victim from having to testify at trial. This court rejected a challenge to the sentence, reasoning

that the sentencing court had properly exercised its discretion. *State v. Sandefer*, 79 Wn. App. 178, 184 (1995).

Community Custody Conditions

Philip Lester asks that we strike community custody conditions 20 and 23 as not being crime related. The State concedes the assignment of error. We accept the State's concession.

A sentencing court may impose crime-related prohibitions. RCW 9.94A.505(9); RCW 9.94A.703(3)(f). This court reviews sentencing conditions for abuse of discretion and will uphold conditions that are reasonably crime related. *State v. Nguyen*, 191 Wn.2d 671, 683, 425 P.3d 847 (2018). A condition will be upheld if "some basis for the connection" between the condition and the crime exists. *State v. Irwin*, 191 Wn. App. 644, 657, 364 P.3d 830 (2015).

No evidence at trial linked Philip Lester's criminal acts to internet use or to the use of photographic equipment. This court previously struck down a condition prohibiting internet use when no evidence in the record suggested that internet use contributed to the crime. *State v. O'Cain*, 144 Wn. App. 772, 775, 184 P.3d 1262 (2008).

CONCLUSION

We affirm Philip Lester's convictions and his sentence. We remand to the sentencing court to strike community custody conditions 20 and 23.

No. 38003-3-III
*State v. Lester*

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Siddoway, C.J.

_____
Staab, J.